UNITED STATES, Appellee

v

GEORGE M. NARENS, JR., Basic Airman,
U. S. Air Force, Appellant

7 USCMA 176, 21 CMR 302

No. 7662

Decided June 22, 1956

*Walter L. Nixon, Jr.*, Esq., argued the cause for Appellant, Accused. With him on the brief were *Captain Cornell DeGrothy* and *Captain John H. Leonard*.

*Captain Anthony Ortega, Jr.*, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis* and *Lieutenant Colonel Francis P. Murray*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was charged with conspiracy to commit an assault with intent to inflict grievous bodily harm upon Airman Third Class Hartman (Charge I), the consummated assault in which Airman Hartman suffered, among other things, "facial and skull fractures" (Charge II), and escape from confinement (Additional Charge). Tried with a coaccused, he pleaded guilty to escape and not guilty to the other charges. However, he was convicted on all charges and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for seven years. The convening authority approved the findings of guilty and modified the sentence by reducing the confinement to five years.

While the case was pending review before a board of review, the accused filed a petition for new trial on the ground that a "key" Government witness, Airman D. R. Sutphin, testified falsely. The board of review denied the petition for new trial and affirmed the conviction. We granted review on the following issues:

"1. Whether the Board of Review erred in denying the Petition for a New Trial.

"2. Whether the law officer erred in permitting trial counsel to impeach the prosecution witness Turner."

Some prisoners in the stockade at Keesler Air Force Base were apprehended by a guard for breaking into the stockade dining hall. In a statement to Agent Charles E. Flanagan of the Office of Special Investigations, the accused admitted that he was one of the intruders. Airman Sutphin testified that later he saw the accused and three other prisoners at the accused's bunk on the upper floor of the medium security barracks. He overheard them talking "about getting even" with the guard. An hour afterward, he saw four prisoners go downstairs. He went to the window "to see what was going to happen."

Airman Hartman was on guard duty inside the stockade area. His post included the dining hall and the minimum security barracks. The medium security barracks was about fifty feet beyond his post. Hartman testified that

**177**

four prisoners approached him from the direction of the latter barracks. One stopped; the others spread out. One of the group was wearing a black leather glove and asked him for the time. Then, "someone" on the right said "something" and Hartman was struck with an object. He fell down. The prisoner with the gloved hand kicked him in the back; one of the others kicked him in the stomach. In the course of the attack, other prisoners ran up. He estimated that eventually about two dozen persons were around him. Some of these took part in the assault. When the siren sounded, they "broke up and ran away."

Hartman could not identify his attackers. A guard in a tower located near the medium security barracks witnessed the assault. He believed that ten persons took part in it, but he could not recognize any of them.

Sutphin testified that he was at the barracks window with Turner and he saw the attack. He said that four prisoners "started running toward . . . [the guard] and Airman Williams got there first and hit him first"; then the accused "sort of stomped him in the face" and hit him with his fist. Two other prisoners hit the guard with their fists. Sutphin did not know whether other prisoners joined in the attack. Also, according to his testimony, the accused and his companions in the assault returned to the barracks about two or three minutes before the siren sounded. After the incident, Sutphin heard the accused "bragging" that they "got even" with the guard.

On cross-examination, Sutphin admitted that he had "mental trouble" for which he had been receiving psychiatric treatment for about a year. He described his trouble as one in which he sees and talks to people that are not there. He also thinks people follow him and for his protection he carries a pistol and "pipes." Sutphin admitted that he had been convicted for stealing "too many [things] to remember." He believed that he would "frame somebody" if it would help him get out of the stockade. He felt that there were times when he could not "help telling

things that aren't true." Finally, he admitted that he could not see very well from his position at the window, and that he might have "imagined" all that transpired.

Apart from his admissions on cross-examination, Sutphin's credibility was attacked by the defense by independent evidence. It was shown that a partition separated Sutphin's bunk from the accused's. The existence of the partition tends to discredit some of Sutphin's testimony as to what occurred between the alleged conspirators at the accused's bunk. Other testimony indicates that before the incident, Sutphin had improperly charged the accused with the theft of his cigarettes.

In a post-trial affidavit which supports the petition for new trial, Sutphin says that he did not see the assault. He had only heard "some rumors to this effect." He now maintains that "many times I say things that are not true and can't help myself."

Airman J. D. Burkhart testified that he observed the assault from a window in the minimum security barracks. When he first saw it, the guard was on his knees. Five or six prisoners were gathered around. They appeared to be swinging at the guard. The group then fled. It was almost out of sight when the siren sounded. The scene of the attack was not well-lighted. Consequently, he could not identify any of the attackers while they were around the guard. However, when they were "running away from him" he saw the accused. The accused had his head tilted back and Burkhart could see his face in the light of a floodlamp. The accused was then ten or fifteen feet from the guard. Burkhart did not know whether he was part of the group that had attacked the guard.

At some points in his cross-examination and in his examination by the court, Burkhart admitted that he did not actually see the accused leave the scene of the assault. The accused was "set apart" from the rest of the group, and he was unable to say whether the accused had ever been with it. In other parts of his examination, Burkhart said that the accused was in the group and

that he saw him "break away" from it. Burkhart denied that he had been promised benefits in return for his testimony. However, he admitted that he had been extended clemency in regard to the sentence imposed upon him for a larceny conviction.

Another prosecution witness, Airman Vaughns, testified that after the siren sounded all prisoners were required to fall out for a head count. At the time of the formation, the accused told him that "we" or "they" got the guard and "smashed his hand in the shells." Vaughns insisted he was not certain whether the accused said "we" or "they." He attributed his uncertainty to the fact that there was a man between him and the accused, and a "lot" of confusion at the time.

Other prosecution evidence is contained in the testimony of Airman Turner and Agent Flanagan. Turner testified that he saw the assault from his bunk at a window on the upper floor of the medium security barracks. He maintained that no one was there with him. Although he saw the assault, he did not know or recognize the assailants. At that point in his testimony, trial counsel had the reporter mark a document as a prosecution exhibit and defense counsel requested a hearing out of the presence of the court. The request was granted.

At the hearing, defense counsel argued that the prosecution was improperly attempting to impeach its own witness by means of a prior statement. He maintained that two days before Turner had testified at the trial of two of the alleged coaccused. The trial and assistant trial counsel in this case acted in the same capacity in the companion case. In the latter, Turner had also testified that he could not identify the attackers. The accused argued that the Government could not claim that it was surprised by Turner's testimony. As a result, it could not impeach him by means of a prior inconsistent statement. The law officer questioned Turner as follows:

"LO: Airman Turner, do you now claim to tell this court you did not know who these persons were that went downstairs?

"WIT: Yes, sir.

"LO: Please show the witness his statement marked Prosecution Exhibit 6 for Identification. I want the witness to read that statement. Do you still persist in your answer?

"WIT: Yes, sir.

"LO: Very well. The prosecution's objection is well taken that this witness may not be impeached—defense objection—however, it is belief of the court that this witness is manifestly unwilling to give testimony, therefore I declare him a hostile witness and you can ask him questions accordingly."

When court reconvened, Turner testified that he had given a sworn statement to Agent Flanagan two days after the incident. He was asked if he saw the accused and other coaccused go downstairs "just before the incident occurred." He replied, "No, sir, I didn't." Thereupon, the law officer advised Turner of the penalties for false swearing. He read him a passage on the subject from the Manual for Courts-Martial. Over a strenuous defense objection, the law officer admitted Turner's pretrial statement into evidence. He ruled that the statement was admissible because "the witness sits there and persists in saying he knows nothing, when he made a statement that he did. There is no other way to do it." Later, he overruled an objection to part of the statement because "it's part of the witness' statement and part of the situation at the time."

Turner was questioned at length on the particulars of his statement. In the statement, he described the specific role each named conspirator played in the assault. He said that the accused kicked the guard in the face. In his testimony, however, he denied knowing anything about the details. He denied that his statement was true. He explained its falsity as follows: "Well, after it all happened Sutphin was talking about it and that way he talked me into going up and signing it." Turner maintained that he was afraid of Sutphin.

**179**

Agent Flanagan testified as the last prosecution witness. He said that he talked to the accused the day after the assault and again three days later. A preliminary hearing was had on the admissibility of these statements. The accused testified that the agent told him he would keep the accused's statements in "confidence." This was denied by the agent. The law officer ruled that the statements were admissible in evidence. Agent Flanagan said that the accused told him of his apprehension by the guard in the dining hall incident. In his first statement, the accused indicated that he had knowledge of the assault, but he advised the agent that if he talked "he would look worse than the guard." On the second occasion, the accused told Flanagan that several of the prisoners started talking about "getting" the guard. Incited by one of them, they reached a "proper state of mind" to assault the guard. The accused and two others left the barracks. When the guard appeared, one of them hit him. The accused described the actions of several other prisoners in hitting the guard, but would not admit that he had "ever assaulted the guard." At defense counsel's request, the law officer instructed the court that the accused's reliance upon Article 31, Uniform Code of Military Justice, 50 USC § 602, in refusing to answer a question does not constitute an admission or confession of guilt.

Apart from Sutphin's testimony, the accused's guilt rests mainly upon circumstantial evidence. True, ▮▮▮▮ Airman Burkhart in part of his testimony identified the accused, but other parts of his testimony substantially weaken the identification. At best, it places the accused on the scene. The accused's pretrial statements hardly do more. However, mere inactive presence at the scene of the crime is not sufficient to support a conviction. United States v Jacobs, 1 USCMA 209, 2 CMR 115. Thus, the accused's complicity depends upon the permissible inferences that can be drawn from the evidence. Under ▮▮▮▮ the circumstances, no extended discussion is needed to show that independent, direct

evidence of the accused's participation would necessarily influence the court-martial in its findings. Since Turner's pretrial statement purportedly is a direct, eyewitness account of the accused's active participation in the assault, it obviously would have a substantial bearing on the accused's guilt if presented to the court-martial as substantive evidence.

It can be plausibly argued that even assuming the validity of Turner's impeachment, the law officer's rulings did not effectively guard against the danger that the court members would regard the recitals in the statement as substantive evidence. Moreover, trial counsel did not dispute defense counsel's contention that Turner had testified only two days before this trial that he had no material knowledge of the offenses. His testimony had been heard by trial counsel. It is arguable, therefore, that Turner was improperly called as a prosecution witness for the sole purpose of impeaching him by means of his prior inconsistent statement. Fong Lum Kwai v United States, 49 F2d 19 (CA 9th Cir) (1931). See United States v Johnson, 3 USCMA 447, 452, 13 CMR 3. As the Court of Appeals said in Young v United States, 97 F2d 200, 205 (CA5th Cir) (1938), rehearing denied page 1023:

". . . The overwhelming weight of authority however, supports the rule that though trial courts should, in the exercise of a sound discretion to prevent injury from surprise testimony of a hostile or corrupt witness, permit cross examination and impeachment by contradictory statements, it is never permitted to make of the rule an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable ex parte statements the witness has made. To the relaxation of the rule against impeaching one's own witness by introducing his ex parte statement in contradiction of his testimony, it is fundamental, we think,

that the party offering the witness be really surprised at his testimony. Further, it is equally fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as a basis for a verdict, but only to eliminate from the jury's minds any positive adverse effect which might have been created by the testimony which has surprised the offerer."

Impeachment is permitted to enable a party to eliminate, as far as possible, the adverse effect of the witness' testimony. Its function, therefore, is to annul harmful testimony, not to present independent, substantive evidence. Turner denied that he recognized any of the persons engaged in the assault, even after he had been shown his statement. Under the circumstances of the case, it can reasonably be said that the risk that the statement would be given probative value by the court outweighed its value for impeachment. As a result, the statement would be inadmissible. State v Catsampas, 62 Wash 70, 112 Pac 1116; Crago v State, 28 Wyo 215, 202 Pac 1099; Kuhn v United States, 24 F2d 910, 913 (CA9th Cir) (1928), cert den 278 US 605, 49 S Ct 11, 73 L ed 533. In the Kuhn case, the Court of Appeals said:

"... The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised. That being true, in cases, as here, where the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment under the rule. He has done no harm, and there is nothing to cancel or neutralize. While a party is not to be denied the right to attempt to prove his case by an unwilling witness, he is not permitted to get before the jury under the guise of impeachment, an ex parte statement of such witness, by calling him to the stand when there is good reason to believe he will decline to testify as desired, and when in fact he only so declines."

For purposes of this case, we need only to point out that the Government was plainly not surprised by Turner's testimony. See Manual for Courts-Martial, United States, 1951, paragraph 153b. Therefore, it could not use his previous statement to impeach him. The erroneous admission of the statement presents a fair risk that the court-martial was improperly influenced by it in reaching its findings.

The decision of the board of review as to Charges I and II and the sentence is set aside. The record of trial is returned to The Judge Advocate General of the Air Force. A rehearing on Charges I and II and determination of a new sentence by a court-martial may be ordered. See United States v Field, 5 USCMA 379, 18 CMR 3. In view of this disposition of the case, the order denying the petition for new trial is affirmed. See: United States v Greenwalt, 6 USCMA 569, 571, 20 CMR 285.

Judge LATIMER concurs in the result.

Judge FERGUSON did not participate in the decision in this case.