UNITED STATES, Appellee

v

EVERETT G. SIMONDS, Airman First Class,
U. S. Air Force, Appellant

15 USCMA 641, 36 CMR 139

No. 18,704

January 28, 1966

 

*Lieutenant Colonel Andrew S. Horton* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph Buchta* and *Colonel Robert O. Rollman.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

QUINN, Chief Judge:

The accused seeks reversal of his conviction by general court-martial for assault with the intentional infliction of grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928.

The charges arose out of an incident in a restaurant bar at about 3:30 a.m. The victim, Captain David Dalton, and two companions occupied a table adjoining that at which the accused and a group of enlisted airmen were seated. Some words passed between the accused and Captain Samuelson, a member of Captain Dalton's party. Captain Dalton spoke to the accused and another member of his group and the "situation seemed relatively calmed down." A short time later, the accused and Captain Samuelson had a brief physical contact, as a result of which the accused kept "stomping around" and directing "hard looks" at Captain Samuelson. Not long thereafter the officers left. In the restaurant parking lot, which was sufficiently well lighted to provide, as a defense witness testified, "a pretty fair view," Captain Dalton leaned on a car. He talked to one of the members of his group, who was seated inside the car. Suddenly he was stabbed from behind. The blow caused him to collapse. As he fell, he turned and saw the accused run from the area. The Captain saw no one else in the immediate vicinity, but seconds later, as he attempted to rise, he was struck on the head with a bottle by Airman Thomas Moore. Moore had been with the accused in the restaurant. Moore then ran off; and Captain Dalton lapsed into unconsciousness. Airman Frank Wharton also testified that he saw the accused run away from Captain Dalton's side. It seemed to him that just before the accused ran, the ac-

642

cused had been "punching" the Captain. According to Wharton, the path of the accused took him just in front of the place at which he was standing; he saw the accused had "something" in his hand, which "looked like a straight razor." Like Captain Dalton, he noticed no one else "right around" there when the accused was alongside the Captain.

Captain Dalton was taken to a military hospital. In the opinion of the examining doctor, the Captain had been cut with a sharp instrument, which penetrated six to seven inches into the abdominal cavity and perforated a loop of the small bowel. The doctor further testified that the wound could have caused Captain Dalton's death.

For its first witness, the defense called Airman Moore. After he had been sworn, and had given his name and organization, the president of the court-martial interrupted his examination. What followed provides the basis for the accused's first assignment of error:

"PRES: Sir, there is a document that appeared before this court in some unknown manner. It charges violation of the Uniform Code of Military Justice, Article 128. This concerns an Airman Third Class Thomas M. Moore.

"LO: Will you give this to the trial counsel, please, Mr. President.

"(The document was given to trial counsel.)

"LO: Have all the members of the court seen this particular document?

"PRES: No, sir. I saw it. I did not read it entirely.

"LO: May I see it?

"(The trial counsel proffered the document to the law officer.)

"LO: Mr. President, you state that you saw it but you did not read it. Are you not acquainted with the contents of it?

"PRES: Not other than the violation of Article 128 and that the

name of the individual was Thomas M. Moore. The witness just called stated his name as Thomas M. Moore.

"LO: I would like to have this document marked as Appellate Exhibit 1 and it will be attached to the record of trial. (The exhibit was marked by the reporter.) Unless there are objections by either counsel, we will duly proceed with the trial. As I understand it, none of the court members have seen it except the president.

"LT COL ROSSER: I read it in its entirety when I first came in here. I thought it was this. (The court member referred to a copy of the charges pertaining to the accused.) When Colonel Krause came in and opened the procedure guide, this paper was in it.[1] He laid it down and I saw it at that time. So I have read it in its entirety.

"LO: Lt Colonel Rosser has seen this document in its entirety and the president has not read it but is acquainted with what it is. In my opinion, there is no basis for a mistrial. As I understand, Mr. President, this was found in your book of instructions by the previous president, was laid over to the side and Lt. Colonel Rosser read it at that time.

"LT COL ROSSER: Maybe this was incorrect, but after I had read it I put it under here and when this name was called, I called it to Colonel Taylor's attention, because I realized this was the name of the witness that had been called.

"LO: I am asking these questions to get this in the record for the purpose of review. In my opinion this is not a matter which would call for mistrial. Therefore, we will proceed."

The writing referred to in the colloquy between the law officer and the court members had no title or other reference to identify it as part of any

1. Colonel Krause had been excused as a court member.

other document. The text is a typewritten charge and specification alleging that Airman Third Class Thomas M. Moore unlawfully struck Captain David R. Dalton on the head with a bottle. The accused contends that the writing reflects so unfavorably upon Moore that the law officer, on his own initiative, should have probed more fully into its effect upon the court members. His failure to do so, says the accused, constituted prejudicial error.

Initially, there is a substantial question as to whether the accused should be allowed on this appeal to reverse his trial position. At trial, defense counsel did not request further inquiry. This action was consistent with the defense strategy, as disclosed in the final arguments. Although Moore was presented as a friendly defense witness, defense counsel argued that the evidence showed it was more likely that he, rather than the accused, stabbed Captain Dalton. His argument drew silent, but material, support from the suggestion that a formal charge of assault had been laid against Moore. When an accused uses a trial incident for ▌ his own advantage, he ordinarily cannot later contend on appeal that the incident was prejudicial to him. However, the Government has not pressed the point and accused urges us to consider the merits.

A mistrial is "a drastic remedy." 23A CJS, Criminal Law, § 1382, page 1025. It cannot be declared for an insubstantial reason. Downum v United States, 372 US 734, 10 L ed 2d 100, 83 S Ct 1033 (1963). While the courts have not attempted to catalogue all the occasions that justify a mistrial, the guiding rule is that the surrounding circumstances must demonstrate a manifest necessity to terminate the trial to preserve the ends of public justice. United States v Walter, 14 USCMA 142, 145, 33 CMR 354; United States v Johnpier, 12 USCMA 90, 30 CMR 90. In United States v Waldron, 15 USCMA 628, 36 CMR 126, we considered the general question

of a mistrial based upon circumstances affecting a witness, as distinguished from those relating to a party. We pointed out that a preexisting, fixed prejudice against a necessary witness may be as destructive of the integrity of the trial as a fixed prejudice against a party.

Appellate defense counsel describe Moore as a "key" defense witness. For purposes of this appeal, we accept the description. But, the centrality of Moore's position to the defense case does not answer the question of the court-martial's attitude toward him. In other words, the real question is: Did the court members, by reason of reading the paper indicating a charge had been made against him, acquire so fixed an opinion of Moore's credibility as to make it likely they would judge his truthfulness upon the basis of this preexisting opinion, rather than the actual evidence?

Only two of the six members of the court-martial saw the paper or knew its contents. One of the ▌ two, the president, had not read the document in its entirety. His comments leave no doubt that he had not formed an opinion about Moore's credibility as a result of what he read. The other member, Colonel Rosser, read the writing "in its entirety." His remarks indicate he attached no importance to it until Moore appeared as a witness. By that time, the court-martial had heard direct testimony from Captain Dalton about Moore's assault upon him. The Captain's testimony had been admitted without defense objection, and, as noted above, it fitted in with the defense strategy of also attributing to Moore the stabbing of Captain Dalton. The writing, therefore, added nothing to the evidence, except that a formal charge may have been lodged against Moore for the assault. Consequently, if Colonel Rosser had any impression as to Moore's credibility, it was more likely the result of the evidence than what he had read in the paper he found in the trial guide. Even in the worst possible light, however, if there

**644**

was a basis for further inquiry, only he was affected. Where only one of six members of the court-martial is subject to a possible challenge for cause, and the remaining members are not likely to be influenced by the challenge, no manifest necessity for a mistrial is apparent. United States v Waldron, supra. The need is even less apparent if, as here, defense counsel evinces no interest in asserting any challenge. On this record, the law officer was entirely correct in concluding the incident did not justify a mistrial.

The accused's second assignment of error also concerns the witness Moore. On direct examination, Moore testified, in substance, that he saw Airman Ronald Hill standing over Captain Dalton; and he did not see the accused anywhere in the area. On cross-examination, Moore admitted he made previous statements inconsistent with his testimony. The most significant of these is one, made a few days after the stabbing, in which he said he saw the *accused* standing over Captain Dalton when the Captain was on the ground, and another in which he said he did not know who was standing over Captain Dalton.

Neither during Moore's testimony, nor at any other time, did the law officer instruct the court members on the purpose or the effect of Moore's pretrial inconsistent statements. No request for an instruction was made by defense counsel. However, the accused now contends the law officer committed prejudicial error by failing to instruct the court members *sua sponte* that Moore's previous inconsistent statements could be considered only for the limited purpose of impeaching his credibility. See United States v Bryant, 12 USCMA 111, 115, 30 CMR 111; United States v Abernathy, 24 CMR 765, 773–774. Cf. United States v Curry, — F2d — (CA 2d Cir) (1965).

As the staff judge advocate noted in the post-trial review, one is "hard put to argue seriously that the court could possibly attach any weight whatsoever to anything" Moore said. His testimony is evasive, inconsistent, and virtually incredible. Certainly, the court-martial could disbelieve him completely, but whether we should, we need not decide. See Jackson v United States, — F2d — (CA DC Cir) (1965). When a witness is impeached by showing he previously made an inconsistent statement, the "law officer . . . should instruct the court" that the previous statement can be considered only in connection with the credibility of the witness, and not to establish the truth of the matters asserted in the statement. Manual for Courts-Martial, United States, 1951, paragraph 153$b$(2)($c$), page 293; cf. United States v Curry, supra. In United States v Narens, 7 USCMA 176, 181, 21 CMR 302, we said:

"Impeachment is permitted to enable a party to eliminate, as far as possible, the adverse effect of the witness' testimony. Its function, therefore, is to annul harmful testimony, not to present independent, substantive evidence."

The previous statement considered most damaging to the accused is the one in which Moore said ▆▆▆▆▆ he saw Captain Dalton on the ground, with the *accused* "standing over him." At trial, Moore testified he did not see the accused "at all in this area," but rather he saw Airman Hill. Assuming the absence of the limiting instruction led the court-martial to consider Moore's previous statement as evidence on the merits, there is still no fair risk that this consideration prejudiced the accused. Before Moore testified, the Government had woven a tight net of guilt around the accused. Medical testimony established that Captain Dalton had been stabbed with a sharp instrument. Captain Dalton admitted that, at the moment of impact, he did not see the person who stabbed him, but he also testified that, as he felt the impact, he turned around and saw the accused running away. There was no doubt in his mind that no one else was in the immediate area. Under extensive cross-examination by defense counsel, his identification of

**645**

the accused was unshaken. In addition, Airman Wharton testified he saw the accused apparently "punching" Captain Dalton; and when the accused ran away, Wharton saw "something" in his hand that looked like a straight razor. Wharton also saw no one else in the area at that moment. Consequently, Moore's previous statement was patently cumulative. If it had any impact upon the court members it was minimal. The law officer's failure to give a limiting instruction does not, therefore, justify reversal of the findings of guilty. United States v DeBell, 11 USCMA 45, 28 CMR 269; Simmons v United States, 308 F2d 324 (CA DC Cir) (1962); Engram v United States, 325 F2d 226 (CA DC Cir) (1963), certiorari denied, 379 US 980, 13 L ed 2d 570, 85 S Ct 684 (1965).

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

For the reasons set forth in my dissenting opinion in United States v Waldron, 15 USCMA 628, 36 CMR 126, I agree that the law officer did not err in refusing *sua sponte* to declare a mistrial. Here, as in the *Waldron* case, the question presented by the copy of the charges against the witness Moore was whether such affected the members concerned in giving the parties to the trial a fair hearing. This ordinarily calls for use of the challenging procedure and, as did the prosecution in *Waldron*, supra, the defense counsel failed to invoke the same. That, in my opinion, prevents further consideration of the matter here.

I respectfully disagree, however, with the disposition of the other assigned error, which involves the failure of the law officer to instruct the court members concerning the limited effect to be accorded Moore's prior inconsistent statements. In my opinion, such constitutes plain error on the face of the record and, in light

of the fair risk of prejudice to the accused, requires reversal here. In order to set forth my reasons for this conclusion, it is necessary to delve further into the evidence and factual background of this case.

The accused was found guilty of assault whereby grievous bodily harm was intentionally inflicted upon Captain David Dalton, in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction. Intermediate appellate authorities affirmed, with a reduction by the board of review in the adjudged and approved confinement. We granted accused's petition for review on the issues dealing with the court's knowledge of the charge against the witness Moore and the failure of the law officer to instruct on the limited effect of certain prior inconsistent statements which he had made.

Basically, the record shows that a group of Air Force officers, including the victim, Captain Dalton, visited the Alcazar Bar. The accused and several other airmen were congregated there. An altercation started between the accused and one Captain Samuelson. This was soon terminated, and the group of officers determined to leave the premises. As Captain Dalton was assisting another of the officers into an automobile on the parking lot, he was stabbed. He did not see who stabbed him. He "was struck from the back on the right side," and "kind of spun down to the ground." Dalton turned around "to my right and I saw Airman Simonds [about ten feet away] leaving the area." To the best of his knowledge, there was no one else in the vicinity. A few seconds later, he saw the accused charging Captain Samuelson with a bottle in his hands. As he was attempting to arise from the ground, Airman Moore yelled at him to stay where he was. Moore then struck him over the head with a bottle.

According to Dr. Hermann, who examined and treated Captain Dalton,

646

the latter suffered an abdominal wound "one-quarter to one-half inch in length," the width of which "would be one or two millimeters," and the depth of which proved to be "between six and seven inches." From the presence of the wound and its appearance, the doctor opined the weapon used "would be a relatively long, sharp, symmetrical type instrument," with two edges.

Airman Wharton testified he saw the accused "punching him [Captain Dalton] in the back of the head," while he was on the ground. Accused, accompanied by another person, then came toward him. Simonds was armed with a straight razor. It was closed. Airman Taylor, standing next to Airman Wharton, saw accused armed with "what appeared to me like a blade like the barbers use."

For the defense, Airman Moore appeared and testified that, upon seeing trouble was about to develop at the Alcazar, he decided to leave the premises with Airman Barnett. As he started to enter Barnett's car, he heard the sound of a bottle "hitting on flesh or something." He left the car and engaged in a brief scuffle with Captain Samuelson. As he was returning to the vehicle, he saw Captain Dalton lying on the ground "in a crouched position," and "Airman Hill was standing over him." He told Hill to leave Dalton alone, and Hill accompanied him back to Barnett's car. Moore saw at that time that Dalton had been stabbed.

In the car, Moore accused Hill by declaring, " 'I know you done it. Did you throw the knife away?' " Hill replied, " 'Yeah.' "

With the evidence in this posture, trial counsel demonstrated on cross-examination that the witness, Moore, had made prior inconsistent statements in which he had declared the accused was the person he had seen standing over Captain Dalton. In addition, it was brought out Moore had previously stated that Hill informed him, " 'I don't think he's hurt because there wasn't any blood on the blade.' " Moore declared he "put Air-

man Simonds in the statement," as he had been informed by the Office of Special Investigations that Simonds had "made a statement against me."

Testimony of the accused's excellent character was adduced from several of his superiors. In rebuttal, the prosecution was further allowed to show Moore had previously identified Simonds to Special Agent Garza as the person whom he had seen standing over Captain Dalton at the time of the incident. Garza denied telling Moore that Simonds had implicated him in the incident.

Airman Hill also testified in rebuttal that he knew nothing about the incident, although he was present and noticed Captain Dalton "just laying there on the ground." He "tried to help him up," but was required to abandon the effort by the appearance of one of the other officers, who began to throw rocks at Airman Barnett's car. He then left the scene with Airman Moore and Barnett in the latter's vehicle. Moore asked Hill, "did I have his knife?" and Hill jocularly replied, "Yeah, I have it man."

From the foregoing, it is quite apparent my brothers and I are in strong disagreement as to what this record reflects. My brothers characterize Moore's testimony as "evasive, inconsistent, and virtually incredible," and find no fair risk of prejudice to the accused from the lack of a limiting instruction with regard to the prior inconsistent statements with which he was impeached. This they do on the basis that the Government's evidence "had woven a tight net of guilt around the accused," its cords consisting of the fact that Dalton had been stabbed with a sharp instrument; that he saw accused running away; that Wharton saw accused apparently "punching" Captain Dalton; and accused was armed with " 'something' in his hand, which 'looked like a razor.' " The net thus woven may be sufficient in law, but the size of its mesh is such that, in my view, Moore's testimony assumed critical importance in the case.

Thus, Dalton did in fact see the accused, but Simonds was then ten feet away, and Dalton was quite unable to state that he was the perpetrator of the offense. The evidence also reflects that Wharton saw the accused "punching" Captain Dalton, but Wharton also quite plainly stated accused was "punching him in the back of the head" *while* Captain Dalton was on the ground. And Dalton made it quite clear in his testimony that he was stabbed *before* he fell to the ground. It is also true that Dalton was stabbed with a sharp instrument, but, from the nature of the narrow, deep stab wound, that instrument was a "relatively long, sharp, symmetrical type" of weapon with two edges. A better description of a stiletto can hardly be set down. The accused, however, was armed with a *straight razor*, "like a blade like the barbers use." Hence, the inference is plain from the prosecution's own case that accused, armed as he was, could not have stabbed the victim at all. Thus, the "net of guilt" may hardly be said to have been tightly drawn about the accused. To the contrary, it was so loosely pulled that the way was clearly open to the court to accept the defense version of the events which transpired at the Alcazar.

Thus it was that Moore's testimony loomed large in the accused's case. It having been shown from the prosecution's witnesses that Dalton was stabbed with a thin bladed knife of some sort, and that the accused was armed with an entirely different sort of instrument. Moore demonstrated that he saw Airman Hill standing over Captain Dalton, something which, by the way, Hill also admitted in his testimony. Under the heat of the sudden events which had occurred, Moore spontaneously accused Hill of the stabbing and received, not a denial, but an acknowledgment that Hill had discarded his knife, together with the comment that Dalton had not been injured seriously "because there wasn't any blood on the blade." Cf. United States v Mounts, 1 USCMA 114, 2 CMR 20; United States v Nastro, 7 USCMA 373, 22 CMR 163; Department of the Army Pamphlet No. 27-172, Military Justice, Evidence, January 1961, page 216. Again, Hill himself admitted making some comment to Moore about a knife, albeit jokingly. The inference is plain from the evidence presented on behalf of the accused, who was also entitled to have his prior good character weighed in the balance, that he was blameless in the actual stabbing of Dalton, which, in fact had been accomplished by Airman Hill, the only person shown in the record to have been appropriately armed and the only other person shown to have had the opportunity so to act.

It was with the testimony in such critical balance that the prosecution elicited from Moore the fact that he had made prior inconsistent statements in which accused—rather than Hill—had been identified as the person leaning over Dalton's recumbent body. In addition, despite Moore's admission of making such statements, the Government was also allowed to prove affirmatively, through the testimony of Agent Garza, that Moore had so previously identified accused to him. Yet the law officer at no time advised the court that these statements were admissible only for the purpose of determining and weighing the credibility of Moore as opposed to being actual proof that accused, not Hill, was the malefactor. Thus, the Government was permitted to shore up its weak and unsteady case by reliance on inconsistent affidavits made out of court by a defense witness on the sole, critical question of the identity of Dalton's attacker.

In United States v Narens, 7 USCMA 176, 21 CMR 302, we were faced with a situation similar to that now before us. There, a witness was unable to identify the accused as one of a group that assaulted a prison guard. He was impeached by means of a prior inconsistent statement in which he had directly implicated the accused, and, as did Moore here, denied the truth of such prior statement. Of the situation, we said, at page 181:

"Impeachment is permitted to en-

able a party to eliminate, as far as possible, the adverse effect of the witness' testimony. Its function, therefore, is to annul harmful testimony, not to present independent, substantive evidence. Turner denied that he recognized any of the persons engaged in the assault, even after he had been shown his statement. *Under the circumstances of the case, it can reasonably be said that the risk that the statement would be given probative value by the court outweighed its value for impeachment.*" [Emphasis supplied.]

When such an impeaching statement is received in evidence, it is the duty of the law officer to "instruct the court in open session that such proof is to be considered for that purpose only and not for the purpose of establishing the truth of the matters asserted in the statement." Manual for Courts-Martial, United States, 1951, paragraph 153b(2)(c). Otherwise, there is the risk that the statement "would be given probative value by the court." United States v Narens, supra, at page 181; United States v Villasenor, 6 US CMA 3, 10, 19 CMR 129, 136. The instruction must advise the court the statements "could not be considered as evidence of the truth of the matters set forth therein." United States v Ziegler, 12 USCMA 604, 608, 31 CMR 190, 194, concurring opinion of Judge Kilday.

That instruction is lacking here, the result being that the court members were permitted not only to discredit Moore but to accept his out-of-court identification of the accused as substantive evidence in the case. Cf. United States v Narens, supra. True, such an instruction was not requested, but the sole issue in this case was the identity of the perpetrator of the assault upon Captain Dalton. Where such be true, "a miscarriage of justice would be apparent" if we did not review the case. United States v Rowan, 4 USCMA 430, 437, 16 CMR 4, 11. As we declared in United States v Ebarb, 12 USCMA 715, 31 CMR 301, at page 718:

"... While we cannot pretend to understand counsel's failure to seek appropriate guidance for the court members, we are reluctant to charge the accused with responsibility when the result would be a clear miscarriage of justice."

More pointedly, in United States v Stephen, 15 USCMA 314, 35 CMR 286, where "the court-martial members were faced with a pure question of credibility. Whom to believe—Amos or Stephen?" we held it plain error for the law officer to fail to give "a cautionary instruction as to the weight to be given to the testimony of Amos." United States v Stephen, supra, at pages 316, 318. Under the circumstances of this case, it was likewise plainly erroneous for the law officer not to limit the court's consideration of the pretrial inconsistent statements. The sole question, as I have noted, was the identity of Dalton's assailant. The Government's case was weak and, indeed, inconsistent when the nature of the wound is compared with the weapon accused allegedly possessed. Moore's testimony tended strongly to exculpate Simond's at Hill's expense and, in some respects, he was corroborated by Hill himself. Under the circumstances, therefore, there is more than a fair risk the court-martial was misled into believing it could consider Moore's pretrial identification of the accused as substantive evidence of the latter's guilt. United States v Narens, supra. In my opinion, this constituted prejudicial error.

I would reverse the decision of the board of review and authorize a rehearing.