UNITED STATES, Appellee,

v.

Private (E-2) Anthony D. CLEVELAND, SSN 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, United States Army, Appellant.

CM 437121.

U. S. Army Court of Military Review.

16 Feb. 1979.

C.M.R. 131 (1973) (possession of syringe violated local law).

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, Captain Grifton E. Carden, JAGC, and Captain Peter A. Nolan, JAGC, were on the pleadings for appellant.

Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, Major Michael B. Kennett, JAGC, and Major Robert B. Williams, JAGC, were on the pleadings for appellee.

Before DeFIORI, CARNE and THORNOCK, Appellate Military Judges.

## OPINION OF THE COURT

THORNOCK, Judge:

In a general court-martial composed of members the appellant was tried on a rehearing and contrary to his pleas, convicted of murder and carnal knowledge in violation of Articles 118 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918 and 920, respectively. He was sentenced to a bad-conduct discharge, confinement at hard labor for life, and reduction to the grade of Private (E–1). The sentence was approved by the convening authority. Appellant is before this Court for mandato-

ry review in accordance with Article 66, UCMJ, 10 U.S.C. § 866.

Appellant urges three errors for our consideration: that the military judge erred by not granting defense's challenges for cause of the court president; that the military judge erred by not granting a mistrial; and that there was insufficient evidence to find the appellant guilty beyond a reasonable doubt of murder because he lacked the requisite mental capacity at the time of the killing. We find no prejudicial error in the appellant's trial.

## I

Although the facts were not seriously contested at the trial, a brief recital of them is necessary to the understanding of the disposition of the assigned errors. The appellant, who had been in Germany but two weeks at the time of the offenses, met the victim, Lucia or "Lucy," a 15-year-old German girl, at an enlisted men's club in Giessen, West Germany, on 1 April 1977. He was told by another soldier that she was "too young," only 14 or 15 years of age. The next day he saw Lucy briefly at a carnival and finally on 3 April 1977 he saw her outside the main gate to his barracks. She was talking with two men. As the appellant joined the group, she indicated she did not want to go home, that it was too late, and that she had missed her train. She said she needed a place to stay and attempted to go into a large apartment house nearby. She encouraged the appellant to stay with her, but he indicated they could not remain there. As they left the apartment house in search of a taxi, Lucy took the appellant's hand and pulled him close saying she was cold. The appellant thought that this was a "golden opportunity" to have sexual intercourse with the girl. He said he knew it would be okay, and that it would not be rape because she consented. He further admitted that they then had intercourse and that the victim offered no resistance. Following the intercourse he

indicated to Lucy that he had to leave. At this point Lucy chided the appellant, "You are like Willie, you make love and then go." She made motions as if appellant had made her pregnant and threatened to go to the police. The appellant pleaded with her not to go to the police. Despite his tearful pleas she continued to threaten him with going to the police. Appellant then "lost control," hit her and choked her until she went limp, and he was sure she was dead. He then dragged the body to a nearby ditch. Prior to moving the body he removed all the clothing from its lower portion, as a precaution against fingerprints. He placed the clothes in a plastic bag and later hid them. He covered the bottom portion of Lucy's body with leaves and twigs because she was a woman and was "entitled to a little respect."

During the course of the lengthy trial, but especially during the psychiatric testimony,[1] the actions of the president of the court, Colonel "B" were thrice challenged by the defense because of what they perceived was an abandonment of his impartial role as a court member. The actions complained of were the shaking of his head, making disparaging looks, writing notes to other jurors, and having discussions with witnesses during breaks in the trial. Well after the court was sworn, during the case in chief, Colonel "B" was challenged for cause. The military judge conducted a careful and admirable out-of-court inquiry of all members separately, including Colonel "B", to determine if they had noticed anything untoward in Colonel "B's" actions or if he had tried to influence them in any way. This inquiry revealed that the court members were paying attention to what was going on in the witness chair, not to what Colonel "B" was doing. If the members noticed anything, they testified they placed no credence in it.

After findings, during lengthy extenuation and mitigation testimony by one of the psychiatrists, who had testified during the

---

1. Before trial the appellant was examined by two separate Army psychiatrists. Each examination was preceded by lengthy psychological

testing, either administered by or supervised by two separate Army psychologists. All four of these professionals testified during the trial.

case in chief, Colonel "B's" actions were again questioned. Colonel "B" had written a note, "talker ain't he" and appeared to show it to one of the court members. As a result of this action, the defense challenged Colonel "B" and moved for a mistrial. Again, out-of-court hearings were held during which court members were again questioned to determine if they had been affected by Colonel "B's" actions and if they were complying with the military judge's instructions concerning communications with witnesses and among themselves prior to findings and sentence in the case.[2] At the close of this second inquiry the judge denied both the challenge and the motion for mistrial.

## II

We turn now to the appellant's assignments of error.

### A—Challenges for Cause.

▮▮▮ Appellant first urges that the challenges for cause of Colonel "B" were improperly denied. We firmly agree that our law provides that an accused is entitled to a court whose members are "mentally free to render an impartial finding and sentence based on the law and the evidence" and "who are uninfluenced by predetermined and fixed ideas." *United States v. Parker,* 6 U.S.C.M.A. 274, 284–85, 19 C.M.R. 400, 410–11 (1955). *See also United States v. Deain,* 5 U.S.C.M.A. 44, 17 C.M.R. 44 (1954). Moreover, the crucial consideration in a challenge for cause is whether the member's presence substantially affected the fairness and impartiality of the court. *See* paragraph 62, Manual for Courts-Martial, United States, 1969 (Revised edition). Given this standard, the military judge's ruling must also be weighed against the " . . . wide discretion . .

vested in trial judges for determining the member's qualifications to sit on a trial . . . ." Further, " . . . appellate courts should reverse only when a clear abuse of discretion, prejudicial to the appellant, is shown." *United States v. Sumter,* 1 M.J. 588, 590 (A.C.M.R.1975), citing *United States v. Parker, supra.* In the instant case, the military judge's careful inquiry of each member of the court firmly disclosed that they had not been influenced by Colonel "B's" actions, in fact, had not seen them nor paid any attention to them. They clearly stated that they were "paying attention to the witness." The out-of-court hearings on this question and those conducted on the motion for a mistrial eloquently speak of the members' veracity and the conscientious manner in which they approached their duty as jurors. Colonel "B's" testimony under oath at these hearings also showed that he had not abandoned his impartial role. We therefore sustain the trial judge's action in not granting the challenges for cause, and find no prejudice to the appellant by his rulings.

### B—Motion for Mistrial.

It is settled beyond cavil that:

A mistrial, . . . is a drastic remedy and "the surrounding circumstances must demonstrate a manifest necessity to terminate the trial to preserve the ends of public justice." *United States v. Simonds,* 15 U.S.C.M.A. 641, 644, 36 C.M.R. 139, 142 (1966). Whether the circumstances warrant that drastic course rests within the discretion of the trial judge; the judge's decision will not be overturned on review unless it constitutes an abuse of that discretion. *United States v. Richard,* 7 U.S.C.M.A. 46, 21 C.M.R. 172 (1956). *United States v. Thompson,* 5 M.J. 28, 30 (C.M.A.1978).

---

2. The military judge previously had cautioned the court members about discussing the case among themselves or with witnesses. During a lunch break the judge observed Doctor "J" speaking with Colonel "B" contrary to those instructions. The judge indicated he was upset and that he was inclined to excuse Colonel "B" for cause. Doctor "J" and court members were called as witnesses in the out-of-court hearing and testified as to the conversations. It was apparent that Doctor "J", not Colonel "B" had initiated the conversations, and that the conversations were about "frostbite" and Doctor "J's" opinion of some senior medical officers in Europe. All discussions were unrelated to the trial or any of the witnesses or issues at the trial.

■ Again the military judge handled a difficult and sensitive situation in an admirable manner. He discussed the incidents with counsel, allowed *voir dire* of the members and gave cautionary instructions. The out-of-court hearing on the motion amply demonstrates the care taken to insure that any impropriety on the part of Colonel "B" did not affect the remaining members. We have carefully reviewed those proceedings and conclude that there was no abuse of discretion by the trial judge in denying the motion and therefore there was no prejudice to the appellant. We likewise agree with the trial judge's conclusion on the record, "[we] don't like what he [Colonel "B"] did, but it certainly is not indicative of a lack of ability to act fairly in this case."

### C—Mental Responsibility.

Appellant was first tried in July and August of 1977. On 25 July 1977, *United States v. Frederick,* 3 M.J. 230 (C.M.A.1977) was decided. Thereafter, the convening authority ordered a complete rehearing, which we now review. Two Army psychologists and two Army psychiatrists examined the appellant. They were unanimous in their diagnosis that the appellant suffered from a mental disease or defect called "borderline personality." The fact finders had no direct evidence to counter that diagnosis and thus the first criterion of the *Frederick* test[3] was satisfied. We also find as a fact that the appellant was, at the time of the offenses charged, suffering from a mental disease or defect called "borderline personality." We must now determine, as did the trial court, if, *as a result of that disease or defect* he lacked the substantial capacity to

appreciate the criminality of his conduct *or* conform his conduct to the requirements of law. After proper instructions by the trial judge and the staff judge advocate's review, the fact finders by their findings and the convening authority by his action rejected the appellant's contention that the second and third criteria of the *Frederick* test were also satisfied. We likewise reject the appellant's contention.

■ Appellant proffers a unique argument on the legal sufficiency of the evidence. He argues that since the psychiatric testimony agreed on a diagnosis of mental defect or disease, but disagreed on appellant's capacity to appreciate the criminality of his conduct or to conform to the requirements of law, that there was no way the fact finders could have found him mentally responsible beyond a reasonable doubt. Juries or bench trial judges by their very nature are called upon to make decisions based upon conflicting testimony. Myriad other factors enter into those determinations.[4] In the case *sub judice* the psychiatric testimony clearly painted the picture of appellant as a borderline personality upon whom stressful situations could cause "psychotic episodes." Further, that a key stress point to him was his ambivalent relationship with women, especially those whom he perceived to be rejecting him or punishing him. Given this personality make up, the situation in which the appellant found himself was extremely stressful.[5]

■ The psychiatrist called by the defense, Doctor "S", had interviewed the appellant prior to his first trial and had seen

---

3. *Frederick* adopted the American Law Institute Model Penal Code § 4.01 test which is:
   (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

4. Much of a trial judge's instruction to juries goes to the credibility of witnesses, their demeanor and the witnesses' opportunity to observe the situation about which they are testifying.

5. Appellant, a black soldier, was raised in a high crime, high violence neighborhood in St. Louis, Missouri. He was raised by women without a substantial father figure in the home. His background experience with police was that they were most often white men; further, he was fearful of how German police would react to a black soldier having harmed a young white girl. The psychiatrists agreed that this background made the victim's threat to go to the police after the intercourse extremely threatening to the appellant.

him only once for "approximately two hours." In addition, to assist in his diagnosis, he had the Article 32, UCMJ, investigation and a report of testing by a psychologist. The government's rebuttal psychiatrist, Doctor "J", on the other hand had seen the appellant on four separate occasions for interviews of approximately two hours each. In addition, during Doctor "J's" observation the appellant was admitted to the hospital psychiatric ward where he stayed for five days. He was given a complete physical examination, which was within normal limits, and was under the constant observation of a ward physician, a psychologist, trained psychiatric nurses, and technicians. Doctor "J" testified that his diagnostic conclusion was based upon input from all these sources in addition to his own lengthy interviews. Contrary to Doctor "S's" conclusion, Doctor "J" concluded that as to both the carnal knowledge and murder charges, that although appellant suffered from a mental defect or disease it did not substantially affect his ability to appreciate what he was doing or conform his action to the requirements of law. As to intent to kill, Doctor "J" stated that he "would not like to make any judgment" as to that particular intent, but he did testify that notwithstanding the appellant's diminished capacity to think and act, that capacity was not obliterated, and in this situation he still had a rational plan to stop the victim or dissuade her from going to the police which involved "knocking her around" and "choking her." Under these circumstances, we conclude that the appellant was responsible for his actions beyond a reasonable doubt, and there was no error in the trial court's finding.

### III

■ Appellant urges that life imprisonment is too severe and that sentence amelioration is appropriate. We disagree. Appellant gratified his lust upon a 15-year-old German girl and thereafter strangled her with his bare hands. Although not a premeditated and calculated killing, nevertheless it was a vicious act of homicide for which the approved sentence is warranted.

We note however, that in his action on the rehearing now being reviewed, the convening authority did not properly credit the appellant for that portion of the sentence served between the date of the sentence at the original trial and the date of the rehearing as required by paragraph 89c(8), Manual for Courts-Martial, United States, 1969 (Revised edition). We will correct this omission in our decretal paragraph.

Accordingly the findings of guilty and the sentence are affirmed. The appellant will be credited with confinement from 11 August 1977 until 30 January 1978 and any other portion of the punishment served or executed from 11 August 1977 to 30 January 1978, under the sentence adjudged at the former trial of this case.

Chief Judge DeFIORI and Senior Judge CARNE concur.