UNITED STATES, Appellee,

v.

Sergeant David W. DONLEY,
004–70–1106, United States
Army, Appellant.

ACMR 8802432.

U.S. Army Court of Military Review.

4 May 1990.

Reconsideration Denied June 20, 1990.

For Appellant: Captain W. Renn Gade, JAGC (argued), Captain Jeffrey J. Fleming, JAGC (on brief).

For Appellee: Captain George R. Johnson, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Martin D. Carpenter, JAGC, Captain John J. Hogan, JAGC (on brief).

Before FOREMAN, SMITH and VARO, Appellate Military Judges.

## OPINION OF THE COURT

VARO, Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of officer and enlisted members of premeditated murder of his wife and committing an indecent act, violations of Articles 118 and 134, Uniform Code of Military

Justice, 10 U.S.C. §§ 918 and 934 (1982). His approved sentence provides for a dishonorable discharge, total forfeitures, reduction to Private El and confinement for life.

The appellant's wife was killed on 8 or 9 May 1988 after she returned home with Chief Warrant Officer 2 (CW2) H. At trial CW2 H testified that he had dated the victim for approximately five weeks before her death, that they had been lovers, that Mrs. Donley had told him she was divorced, and that he did not know she was married until he was told by appellant on 8 May 1988, at which time he left the house. Following cross-examination on his testimony, the military judge asked if any members of the court-martial had questions for CW2 H. The president of the court-martial asked the following two-part question which is at issue in this case:

In the discussion where Mrs. Donley told you she was divorced, did she talk about her former husband? What did she say?

The trial defense counsel objected to this question arguing that it would elicit answers regarding the victim's statements about her husband's alleged attempts to kill her, and also noted that such matters had already been determined to be inadmissible by the military judge at an Article 39(a), UCMJ, session held earlier in the trial. At that session the military judge had ruled that other similar out-of-court statements, made by the victim to another witness, were inadmissible. Following this ruling, the government decided not to pursue the matter further and never called CW2 H to testify at the Article 39(a) session.

The military judge asked the question posed by the president of the court-martial but then called a sidebar conference to allow all parties to hear the answer before allowing it to be published to the members. The following discourse occurred at the sidebar:

MJ: I want to hear what the witness is going to say here at the side-bar.... Now, lean over hear and tell me what it was that she stated.

WIT: I asked her the question as to why she had been divorced and she simply told me that her husband had tried to kill her before. I asked her how and she told me that it was by strangulation or choking.

The military judge then recessed the court and held an Article 39(a) session at which he determined that he would not let CW2 H answer the question posed by the president of the court-martial because the alleged statements by the victim lacked reliability.

Affidavits submitted to this court reveal that following the Article 39(a) session, the senior defense counsel, who was at the trial as a spectator, advised the trial defense counsel that he had heard the entire sidebar conference, to include the answer by CW2 H. An affidavit from the regional defense counsel, who was also in the courtroom as a spectator, states that the matters discussed could be heard by everyone in the courtroom. The senior and regional defense counsel met with both trial defense counsel to discuss the issue and the possibility of requesting a mistrial. The trial defense counsel determined that *voir dire* of the members would be necessary to determine what, if anything, had been overheard.

When the court-martial reconvened the next morning, the military judge advised the members of his determination that the question would not be answered. The military judge then asked if any of the members had heard CW2 H's response during the sidebar. The president of the court-martial responded in the affirmative. The military judge asked the other members to withdraw and then had the following discussion with the president:

MJ: Colonel H..., can you relate what you heard?

PRES: I heard something about that she had related that he had tried this before and tried to choke her or ... strangulation, or words to that effect.

MJ: For your edification, I ruled that the answer ... the response to that question was inadmissible because, under the circumstances, I did not perceive it to be ... to have an indicia of reliability. Ac-

cordingly, that response should not be before any member of the court. (Pause.) It must not be considered and may not be considered in evaluating or making a determination as to the guilt or innocence of this accused,... Can you disregard what you've heard?

PRES: To the extent that any human being can disregard something that he's heard and try to put it out and not make it relevant to your thought-process, I will attempt to do so.

MJ: Unfortunately, I can understand what you're saying but it also sounds as if it's a quasi–....

PRES: I don't think that any reasonable individual could offer you anything other than that, judge.

\*        \*        \*        \*        \*        \*

TC: Sir, if you were instructed by the judge that hearsay statements without sufficient indicia of reliability are to be disregarded, could you follow his instructions under the law?

PRES: Yes. I don't know what's going to happen when we try to adjudge this fellow's innocence or guilt; we'll all make our statements and I will not use that statement back in those discussions. The fact that it will bear on my own vote ... my own vote, I cannot say that I can exclude it totally, but I will not use it in the discussions.

Pursuant to a request from the trial defense counsel, the military judge then called the two members of the court-martial who had been sitting to the right of the president, and closer to the bench to determine what, if anything, they had heard. One member advised the military judge that the conversation had been "pretty loud," but he knew that he was not supposed to hear it so he turned around and paid no attention to it. The other member stated he heard talking which he could not understand. He clarified this further by stating that he had a hearing problem which limited his ability to clearly hear low tones, such as the sidebar. The military judge then recalled the president of the court-martial:

MJ: [R]ecognizing human frailties, are you satisfied that you could disregard that statement in your deliberations? I appreciate that you won't mention it to the other members, but can you, personally, disregard that ... what you overheard in your deliberations on the findings in this case?

PRES: I believe I can. I mean, I will give it my best shot. To say exclusively "Yes" or "No", I don't think any human being can do that. But I will give it my best shot and will try to completely disregard it.

Following the withdrawal of the president from the courtroom, the military judge continued the discussion with counsel for the appellant:

MJ: Lest there be any doubt: if the defense moves for a mistrial, I will grant it. (Defense counsel and assistant defense counsel conferred.)

MJ: Counsel, our evaluation of this issue is taking too long. Under the circumstances, I propose to grant a mistrial, absent an objection by the defense.

ADC: The defense would object, sir, to the mistrial.

\*        \*        \*        \*        \*        \*

MJ: Sergeant Donley, do you concur in that position?

ACC: Yes, sir.

■ The appellant now asserts that the military judge erred in failing, *sua sponte*, to declare a mistrial. Appellant further asserts that he was denied effective assistance of counsel when his defense counsel failed to move for a mistrial and objected to the military judge's proposal to declare a mistrial.

■ Among his many duties, the military judge "is more than a mere referee, and as such he is required to assure that the accused receives a fair trial." *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975). One of the powers available to a military judge includes the ability to declare a mistrial if necessary to the accomplishment of his duties to protect the fairness of the trial. *United States v. Lynch*, 26 C.M.R. 303 (C.M.A.1958). While a mili-

tary judge may declare a mistrial "in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceeding," [1] such a drastic remedy should be used only where the circumstances demonstrate "a manifest necessity to terminate the trial to preserve the ends of public justice," [2] such as when inadmissible matters heard by court members are so prejudicial that a curative instruction would be inadequate.[3] The determination to declare a mistrial is a matter within the discretion of the military judge and normally will not be reversed absent a clear abuse of discretion under the facts and circumstances of the case.[4]

■ The receipt of improper evidence by a court-martial may, in and of itself, be grounds for a mistrial.[5] In *Johnpier*, the Court of Military Appeals held that it was not an abuse of discretion for the law officer to declare a mistrial rather than instructing the panel to disregard the improper testimony. We agree that granting a mistrial is not the only curative measure for all cases [6] where improper evidence has been received. However, in the case at bar, it is the only remedy to assure a fair trial for the appellant.

The comments by the president of the court-martial to the military judge were extremely candid. Although he stated that he would not use the information from the sidebar in his discussions with his fellow court members, he also opined that no reasonable person, including himself, could completely ignore what he had heard. It is obvious the military judge realized the potential for prejudice as he advised trial defense counsel that a mistrial would be granted, if requested, or declared *sua sponte*, absent an objection. We are well aware of the possible former jeopardy bar to a second trial when a trial is terminated by mistrial over defense objection, as noted in Judge Smith's dissent and his reference to *Burtt v. Schick*, 23 M.J. 140 (C.M.A. 1986). However, such ramifications do not change the ultimate responsibility placed on the military judge. He is the sole arbiter regardless of the desires of counsel or the accused.

■ The appellant has a constitutional right to trial by an impartial jury.[7] He was charged with killing his wife by strangulation. In our opinion, the receipt of an inadmissible statement from a deceased victim that the appellant had tried to choke her to death "cast[s] substantial doubt upon the fairness of the proceedings." [8] The president of the court-martial was unable to assure the military judge that he could disregard what he had heard. Thus, the appellant was tried by a jury only four-fifths of which met the constitutional standard of impartiality. Therefore, a mistrial should have been declared.[9]

Based on our determination above, we need not address the appellant's second assignment of error.

We have considered the issues raised personally by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty and the sentence are set aside. A rehearing may be ordered

---

1. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 915 [hereinafter R.C.M.].

2. *United States v. Simonds*, 36 C.M.R. 139, 142 (C.M.A.1966).

3. R.C.M. 915 discussion.

4. *United States v. Morris*, 13 M.J. 297, 301 (C.M.A.1982) (Cook, J., concurring).

5. *United States v. Jeanbaptiste*, 5 M.J. 374, 376 (C.M.A.1982); *United States v. Johnpier*, 30 C.M.R. 90 (C.M.A.1961).

6. *Jeanbaptiste*, 5 M.J. at 376.

7. U.S. Const. amend. VI.

8. R.C.M. 915.

9. A less drastic method of relief in the form of a *sua sponte* challenge of the president of the court by the military judge was not a viable alternative in this case. Such action would have brought the court below the statutory minimum at a time when twelve of the fifteen total prosecution witnesses already had testified before the court-martial.

by the same or a different convening authority.

Senior Judge Foreman concurs.

SMITH, Judge, dissenting:

When asked if he could disregard what he had heard, the president of the court-martial responded, "to the extent that any human being can disregard something that he's heard and try to put it out and not make it relevant to your thought-process, I will attempt to do so." The president continued, "I don't think any reasonable individual could offer you anything other than that judge." After instructing that the overheard statement was inadmissible and unreliable hearsay that must be totally disregarded, the trial judge asked, "But can you personally disregard that ... what you overheard in your deliberations and findings in the case?" The president responded, "I believe I can. I mean, I will give it my best shot. To say exclusively 'Yes or No,' I don't think any human being can do that. But I will give it my best shot and will try to completely disregard it."

My brothers find that the overheard hearsay statement together with the equivocation by the president of the court-martial present a situation where there was a fair risk of prejudice requiring the judge to declare a mistrial. I respectfully disagree. The president's candid statements simply represent his belief that he would follow the judge's instructions with the understanding that no one is completely aware of the extent to which such an overheard statement might impact on his thought process. In short, he was stating the obvious.

Under these circumstances, I believe that the trial judge and counsel for appellant were in a far better position than this court to evaluate the desirability or necessity for a mistrial. Counsel's decision to object to a mistrial was a carefully considered, rational decision made under circumstances that allowed full consideration of the president's demeanor and the state of the evidence at trial. I find that there was no manifest necessity for declaring a mistrial. Indeed, had the trial judge declared a mistrial over defense objection, we might now be faced with the question of whether former jeopardy barred a second trial. *See Burtt v. Schick,* 23 M.J. 140 (C.M.A.1986).

I would affirm the findings and sentence.