UNITED STATES, Appellee

v

RUDOLPH BRYANT, Airman Second Class, U. S. Air Force, Appellant

12 USCMA 111, 30 CMR 111

No. 14,292

Decided January 19, 1961

*Major Charles K. Rush* argued the cause for Appellant, Accused. With him on the brief was *Colonel James L. Kilgore.*

*Captain Richard T. Yery* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Merlin W. Baker.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This is an appeal from a conviction for two violations of a Sixteenth Air Force Regulation, prohibiting traffic in merchandise obtained from commissaries, exchanges, and other retail outlets for American armed forces in Spain. The question before us is the admissibility of certain testimony by two Government witnesses.

Specification 1 of the Charge, which is laid under Article 92, Uniform Code of Military Justice, 10 USC § 892, alleges that the accused obtained two cartons of cigarettes and a box of cigars from an armed forces retail outlet and sold them on September 24, 1959, to Francisco Paracuellos Lamarca, a Spanish national not authorized to buy from any such outlet. Specification 2 sets out a sale on September 8, 1959, of two cans of Nescafe and seven cartons of cigarettes to Roig, also a Spanish national not authorized to make purchases from armed forces outlets.

Cutting through much irrelevant testimony, it appears that as early as April 30, 1959, the accused had read and purportedly understood the prohibitions of the regulation. About September 23, Lamarca, a Spanish national employed as a bartender at the Capri Bar in the city of Zaragoza, asked the accused to bring him some "tobacco" which he wanted for a wedding. The next day the accused appeared at the bar and told Lamarca that he had "this tobacco" in his car. Murillo, a youthful employee, was sent out to the car to pick up a "parcel." Murillo found the car locked. He returned to the bar. Then, accompanied by the accused, he returned to the car. It was unlocked by the accused and Murillo took out a parcel, which consisted of a black sweater covering some objects. "From the side" Murillo saw a carton of Marlboro cigarettes.

He thought he also saw a carton of Chesterfield cigarettes. He brought the parcel back to the bar, and turned it over to Lamarca. Lamarca testified he received two cartons of Pall Mall cigarettes and a box of cigars, which he could not identify by name. He paid the accused 125 pesetas for each carton of cigarettes, and 225 pesetas for the cigars. It further appears that American cigarettes were not imported into Spain, and were not available from regular Spanish sources. The remaining evidence bearing on specification 1 appears in the testimony of Special Agent Haughian. He said he interviewed the accused on October 7, 1959. After advice as to his rights under Article 31, and that he was being interrogated in connection with black market activities and the sale of exchange items to unauthorized persons, the accused voluntarily informed Haughian that "since he had been in Spain any items of smoking products—cigarettes or tobacco—or both, or food items, were bought from the Zaragoza AFEX or Zaragoza Commissary."

Turning to specification 2, Roig testified he purchased "seven cartons of tobacco, two Nescafe cans and . . . [he thought] two or three of chewing gum" from the accused. The transaction, he said, took place in the accused's apartment, and he paid him in local currency at the time of purchase. Roig did not know the brand name of the cigarettes, but he thought they were "Pall Mall and some green color." He "suppose[d]" they were American products because he purchased them from the accused. Initially, Roig testified the purchase was made "a long time ago." Apparently not satisfied with that answer, trial counsel handed the witness a statement which he had made "to the police." Without asking whether the statement was sufficient to refresh the recollection of the witness,[1] trial counsel proceeded to elicit

[1] United States v Bergen, 6 USCMA 601, 20 CMR 317; see also United States v Narens, 7 USCMA 176, 21 CMR 302.

testimony to the effect that the witness had given the statement to the police; that he had told them he did not recall the date of the purchase; that he was informed by them that "it was not important," and that he should "put last month"; that he complied with their request; that his statement of the purchase was "true, but concerning the date . . . [he] said . . . [he] didn't recall." On cross-examination, Roig said the transaction took place "three or four months" before his statement, but he was "not sure."

Special Agent Haughian's testimony also bears on specification 2. Besides his October 7 interview, which is described above, he and another agent interviewed the accused on May 15th. Defense counsel objected to the admission of evidence of what transpired at that meeting, but the objection was overruled. The admissibility of that part of Haughian's testimony is challenged on this appeal. Haughian said that at the May 15 meeting, the accused was advised of his rights under Article 31 and informed that the agents were investigating "the sale and disposal of Exchange items . . . primarily cigarettes and cigars." Thereafter, the accused voluntarily disclosed that "on a couple of occasions" he was present in his apartment when exchange items "had been disposed of." These items had been purchased at the Zaragoza Air Base Commissary. The accused told the agents he was "unfamiliar" with the regulation prohibiting traffic in these items. Accordingly, the "important portion" of the regulation was read to him, and the accused said he understood "what he could do and couldn't do."

The admissibility of the evidence of the May 15 meeting was challenged on the ground that it constituted irrelevant and immaterial evidence of other acts not charged. See Manual for Courts-Martial, United States, 1951, paragraph 138g. Comparison of the dates alleged in the specifications with the date of the interview suggests that the latter relates to conduct other than that charged. Thus, the specification dates are September 8 and 24, whereas the interview took place the preceding May. Closer examination of the issue, however, shows a possible connection between the interview and Roig's purchase. Roig testified he made his purchase in the accused's apartment. Despite his pretrial statement that the sale occurred in September, in his testimony he insisted it took place about three or four months before October. His sworn testimony suggests, therefore, that his purchase was one of the "couple of occasions" mentioned by the accused. If this was all the record showed, we might be inclined to say the court-martial could find that Haughian's testimony did not relate to other acts, but rather constituted admissions by the accused in regard to the Roig specification. The issue, however, is complicated by the Government's theory of prosecution.

Time and again, trial counsel implied that Roig's testimony as to the date was false, and that his pretrial statement was true. Illustrative of this approach, is his argument against a defense motion for a finding of not guilty of specification 2. He said:

". . . let us face it. This man on the stand [Roig] was a necessary witness I had to call and I, as the prosecutor, must rely on the statements which these people bring to the police and I would like you to bring your common sense into play when you judge the credibility and about this type of situation."

In reply to defense counsel's objection to Haughian's testimony about the May 15 interview, he said he "intend[ed] to bring out . . . the same type of testimony, . . . which . . . [he] elicited from Airman Harris." Airman Harris had previously testified about other sales by the accused. The admissibility of his testimony was also challenged by the accused; it, too, is the subject of this appeal. It clearly appears, therefore, that the Government believed the May 15 admissions relate to offenses other than those charged. While the limited view it took of the effect of the evidence was not binding upon the court-martial, there is a fair risk that the court-

martial accepted the Government's theory and concluded that Roig's purchase was made in September.[2] We are constrained, therefore, to consider Haughian's testimony from the standpoint for which it was offered and received; namely, evidence of offenses other than those charged.

Other evidence of additional sales was offered by the Government, and received over defense counsel's objection. Airman Pat Harris was allowed to testify that "four or five times" in the months of March and April, he saw the accused sell coffee and cigarettes to Spanish nationals. However, he purported to know where the accused obtained these articles only in regard to a sale in March. Although he did not say he saw or was with the accused, he maintained the accused purchased the items from the commissary. His testimony on that point is as follows:

"Q Do you have any evidence as to where Airman Bryant obtained these?
"A Once.

"Q Will you go into that?
"A He purchased them in the Commissary. He purchased them in the Commissary in the month of March. Then he went down and changed his clothing and sold them.

"Q Were you with him when he sold them?
"A That night at the Pigalle.

"Q To the Spanish?
"A Yes.

"Q What type of items did he sell?
"A Coffee and cigarettes."

Trial counsel contended that Harris' testimony was admissible on the ground it tended to prove plan or design on the part of the accused. The record indicates, as we have already observed, that he advanced the same reason for the admission of Haughian's testimony about the May 15 interview with the accused. While he made no attempt to relate the plan or design to a particular element of the offense charged, appellate Government counsel maintain that the testimony of both witnesses is admissible to show "the *source* [from which were obtained] the items allegedly sold by the accused." See United States v Kelley, 7 USCMA 584, 23 CMR 48. Whether the present Government position represents a basis of admission different from that advanced at the trial need not detain us. See United States v Haimson, 5 USCMA 208, 17 CMR 208, concurring opinion, Judge Latimer. Also, we need not consider the Government's contention that evidence of other acts of misconduct is admissible without regard to whether it falls within one of the recognized categories of admission if "it has substantial value as tending to prove a fact in issue." United States v Graham, 5 USCMA 265, 267, 17 CMR 265; *Haimson,* supra, pages 226–227.

For the purposes of this appeal, we assume that Harris' testimony, scanty as it is, shows sales of commissary or exchange articles. Those sales, and the ones mentioned in the accused's May 15th interview, must be connected with the sales set out in the specifications of the Charge.

In United States v Kelley, supra, page 589, we said: "It is clear that before a similar offense can be used there must be a reasonably close connection in point of time as well as a 'definite relationship to one of the elements of the offense charged.' " Here, we have a series of sales in March and April which took place at bars and at the accused's apartment. The articles sold were not obtainable from Spanish sources; they were of a kind which, from common experience in the community, the court members could conclude were available in armed forces retail stores in Spain.

[2] Some evidence of the risk appears in the denial of the defense motion to dismiss specification 2. The motion was based on the claim that the evidence was insufficient to show a sale on September 8. The motion was denied and later the court returned findings of guilty without change of date. See United States v Hopf, 1 USCMA 584, 5 CMR 12.

See United States v Weiman, 3 USCMA 216, 218, 11 CMR 216. Thus, the articles sold, and the places at which they were sold, correspond to those incidents of the sales alleged in the specifications. The time interval between the earlier sales is reasonably close to those charged; and the number of sales is sufficient to show the purchase of substantial quantities of exchange items. In these circumstances, evidence of the other transactions reasonably tends to show a plan or design on the part of the accused to purchase exchange items for resale. See United States v Landrum, 4 USCMA 707, 16 CMR 281. The president of the court, therefore, did not abuse his discretion in admitting the challenged testimony.

Our conclusion as to admissibility does not end the matter. The president did not instruct the court ▪ on the limited purpose for which the evidence of other offenses was admissible. Relying upon our opinion in United States v Haimson, supra, appellate Government counsel contend that an instruction is not required, in the absence of a specific request. The *Haimson* opinion does indeed contain a passing reference to that effect. Supra, page 231. However, our opinion in United States v Hubbard, 5 USCMA 525, 18 CMR 149, decided during the same term of Court, suggests that the dictum of *Haimson* was not intended to be a definitive statement of the rule of law. Assessing the effect of evidence of other offenses, we said in *Hubbard*, supra, page 530: "The probability of the risk is heightened *by the failure of the law officer to instruct the court on the limited purpose for which it could consider the evidence.*" [Emphasis supplied.]

Some cases in the Federal courts indicate that, absent a defense request, it is not prejudicial error to fail to give an instruction on the limited purpose for which evidence of offenses other than those charged is admitted. See Breese v United States, 203 Fed 824 (CA 4th Cir) (1913). In our opinion, however, the better rule is that the instruction is a necessary concomitant of such evidence. The Court of Appeals for the Fifth Circuit has pointed out that "requisite caution" in the use of such evidence includes an instruction on the special purpose for which it is admitted. Ahrens v United States, 265 F2d 514, 516 (1959); see also Martin v United States, 127 F2d 865 (CA DC Cir) (1942), concurring opinion by Judge Stephens. The guiding rule in this area was stated by that court in Montgomery v United States, 203 F2d 887, 891 (1953).

". . . The fact that the evidence objected to tended to establish that the accused committed offenses other than those charged in the indictment would be no justification for excluding it if it tended also to establish the commission of the crime charged in the indictment, Capone v United States, 7 Cir., 51 F 2d 609, 619, 76 ALR 1534. We think, however, that the jury should have been cautioned that the evidence was admitted only for the light that it might throw on the federal offenses on trial, and that no inference of guilt could be drawn merely from the commission of other offenses different in character." [Reaffirmed in Barlett v United States, 232 F2d 135 (1956); see also Stansbury v United States, 219 F2d 165 (CA 5th Cir) (1955).]

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and a rehearing may be ordered.

FERGUSON, Judge (concurring in the result):

I concur in the result.

While I agree with the Chief Judge that a limiting instruction must be given *sua sponte* when evidence of other offenses is produced as a proper part of the Government's case, I am of the view that the incidents of accused's prior black marketing were not admissible in this prosecution. Accused was charged with two separate violations of a lawful general regulation in September 1959. The Government produced evidence of similar offenses in March and April 1959. The Charge and specifications do not involve proof

**115**

of any specific criminal intent, knowledge of the regulations involved, motive, plan, or any other basis for admitting evidence of other acts of misconduct. Hence, it does not appear that the proof of prior crimes was admissible. United States v Pavoni, 5 USCMA 591, 18 CMR 215; Manual for Courts-Martial, United States, 1951, paragraph 138g.

Accordingly, I concur only in the result reached by the author of the principal opinion.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I join the Chief Judge in his holding that the evidence was admissible. However, I do not believe the conviction should be set aside and a rehearing ordered because the president of this special court failed to give an instruction on the limited use of the evidence.

I, of course, believe that it is much the better practice to give any instruction which will aid the court, but there are two reasons why I would not reverse these findings. The nature of the separate offenses was identical with those alleged, and in black-marketing operations there is little likelihood that the court-martial members would consider the evidence of similar sales for any illegitimate purpose. More likely they would treat it as evidence of a plan or design which would negate the possibility of accused acting innocently. If considered in that light the absence of an instruction would be harmless. Moreover, I point out that upon defense counsel's objection, counsel for both parties argued the admissibility of the evidence under the exceptions listed in paragraph 138g, Manual for Courts-Martial, United States, 1951. Thereafter, the members of this special court ruled on the objection, so it would appear they were aware of the limited applicability of the testimony.

The principal reason for my disagreement, however, arises out of a belief that my associates are not realistically applying the doctrine of waiver. Here there was no request for an instruction directing the court-martial to limit its consideration of the evidence. While ordinarily we have not applied the rule of waiver in special court-martial cases, the reason for the rule is not present in the case at bar. Generally speaking, the services do not furnish certified lawyers to persons who are being tried by special courts-martial, but the Air Force usually does, and in this case the accused was represented by a qualified attorney. In United States v Haimson, 5 USCMA 208, 17 CMR 208, we specifically held that, unless a request was made for an instruction informing the court-martial that testimony could be considered only for a limited purpose, an accused could not complain on appeal that an instruction had not been given. This is the language we used:

"The only instruction to which the accused was entitled would have been one to the effect that the members of the court might not permissibly consider the evidence of specific misconduct as showing an evil disposition, or criminal propensity, on the accused's part, and from the fact of that disposition infer that he had committed the offenses alleged. Such an instruction would certainly have been appropriate. But the law officer—we are equally sure—was under no duty *sua sponte* to charge the court regarding this aspect of evidence. The burden of requesting such an instruction rested on defense counsel. Cf. United States v Johnson, 3 USCMA 709, 14 CMR 127; United States v Schumacher, 2 USCMA 134, 7 CMR 10."

Apparently we are now placing a greater responsibility on a legally untrained president than we have previously saddled on a member of the bar. I emphasize greater because we refused to reverse a law officer in the *Haimson* case, supra, but with qualified counsel representing an accused in this case we say that the president must assume full responsibility for the alleged lack of instructional guidance. That may seem rational to my

associates, but it seems paradoxical to me to say that an omission by a law officer can be waived by certified counsel when representing an accused in a general court-martial but the same omission by a president cannot be waived by the same lawyer when performing his duties in a special court-martial. In my opinion, if the right to have an instruction given to the court-martial can be waived by a lawyer in a general court, *a fortiori* the same right can be waived by a lawyer in a special court. If that is not so, then, under similar conditions a president of a special court has a higher duty to protect an accused than does a qualified legal officer.

There being no miscarriage of justice if the doctrine of waiver is imposed, I would affirm the decision of the board of review.