UNITED STATES, Appellee

v

JAMES I. DIXON, JR., Captain,
U. S. Army, Appellant

17 USCMA 423, 38 CMR 221

No. 20,499

March 1, 1968

*Major David J. Passamaneck* argued the cause for Appellant, Accused.
With him on the brief were *Colonel Daniel T. Ghent* and *Lieutenant Colonel
Martin S. Drucker.*

*Captain William R. Steinmetz* argued the cause for Appellee, United
States. With him on the brief were *Lieutenant Colonel David Rarick* and
*Major John F. Webb, Jr.*

## Opinion of the Court

FERGUSON, Judge:

Accused was arraigned and tried before a general court-martial convened at Fort Bragg, North Carolina, upon two counts of adultery, four of occupying a motel room for immoral purposes, in violation of a Georgia statute, and six specifications alleging violations of interstate transportation of a woman for immoral purposes, all in contravention of Uniform Code of Military Justice, Article 134, 10 USC § 934. Four specifications regarding interstate transportation were dismissed on motion of the defense. The accused was acquitted of the remaining two and, in fact, convicted only of a single count of adultery and occupying a motel room for an immoral purpose. He was sentenced to be dismissed from the service and to forfeit all pay and allowances. Intermediate appellate authorities have affirmed, and we granted accused's petition for review upon a number of assignments, some of which will be hereinafter discussed.

**423**

## I

A lengthy trial led to the accused's conviction of violating Georgia Code Annotated, Title 52, section 52–9907, by occupying a motel room with Cynthia Bond Huff for the immoral purpose of illicit sexual intercourse, from October 29, 1965, until October 31, 1965. In addition, he was convicted of adultery with the same woman at divers times between January 22, 1966, and June 3, 1966, he then being married.

We need not detail all the testimonial background of the case, particularly in light of accused's acquittal of numerous other allegations against him. Some recitation of the facts, however, is necessary to place the matter in proper perspective.

Cynthia Louise Stover Bond Huff, a college professor several years older than the accused, divorced her first husband some years ago and, in 1959, married her second husband, a dentist, in Mississippi. They, however, did not live together, Mrs. Huff pursuing her academic career in Fayetteville, North Carolina, and her husband practicing in Mississippi. They met only occasionally. She continued to be known in Fayetteville as Mrs. Bond, and, as such, she was introduced to Captain Dixon in the fall of 1964. She alleges, however, that she immediately made known her status as Mrs. Huff to him. They became intimate friends, and a meretricious relationship quickly developed. Mrs. Huff became pregnant and gave birth to an infant daughter in September 1965. According to her, accused had promised her marriage and assisted her financially in obtaining a divorce from Dr. Huff in November 1965, at Meridian, Mississippi. Accused had also been previously married, and she understood the delay in their intended union was only in order to obtain a copy of the annulment order ending his marriage. On her return from Meridian, however, accused told her he was going to marry another woman, to whom he had been engaged for some time, and Mrs. Huff began a vigorous campaign to force him to marry her, commencing with complaints to Army

authorities in an effort to bring pressure to bear on him.

On January 21, 1966, accused married his sweetheart at Fayetteville. Mrs. Huff's complaints to Dixon's Army superiors continued, with, as she testified, the freely admitted purpose "to get his scalp." According to her testimony, she also continued as his mistress, despite his knowledge of her efforts to have him prosecuted. Indeed, the specification of adultery on which he was convicted is based upon her allegation of numerous relations between them, starting the day after his wedding and extending to the date of preference of charges against him.

It is also only fair to state that Mrs. Huff's testimony is fraught with inconsistencies and venomous in its intensity. Having admitted "I was going to get his scalp," she defined that phrase literally by explaining "[w]hat I meant was I was going to kill him." Admitting she had listed Dr. Huff as the father of her child, she persistently charged the accused with its paternity, but conceded her efforts to take civil legal action against accused had been to no avail.

Captain Dixon, testifying in his own defense, declared that he met and dated Mrs. Huff as Mrs. Bond. He was unaware that she was still married until October 31, 1965, when she announced that she intended to secure a divorce. Conceding an earlier meretricious relationship with her, he denied that they thereafter engaged in any sexual relationship. They continued to see each other and both attempted outwardly to mix with friends and conceal their differences. After Mrs. Huff obtained her divorce, she became openly hostile toward him, complaining to the authorities and, in general, seeking an acknowledgment of paternity and support from him. He denied these allegations and advised her to let the civil courts settle the matter.

Captain Dixon categorically denied sexual relations with Mrs. Huff after his marriage on January 21. She persisted in calling him, and he visited her on several occasions in an attempt to placate her and eliminate the embar-

rassment resulting from her complaints to the military. Alibi witnesses and business records from clubs in which the accused played as a professional musician were produced to substantiate his denial of connections with Mrs. Huff on the dates alleged by her. In addition, considerable evidence was adduced as to his excellent character and outstanding efficiency as an officer.

Another witness testified to threats made against accused by Mrs. Huff and her determination to prevent his marriage "or have the Army stop it" and "to kill him if he didn't marry her."

From the foregoing, it will be seen that the court-martial was presented with close, factual questions, to be assessed in light of the obvious bias of the prosecutrix, the impeachment of her testimony, and the contrary version presented by the accused, supported, as it was, by an array of witnesses as to his good character, alibi, and the hostility to him of a woman allegedly scorned. It is in light of this background that we consider the assignments of error.

## II

The first issue inquires whether the law officer erred prejudicially in failing, *sua sponte*, to instruct the court regarding evidence of other misconduct adduced during the testimony of Mrs. Huff. In this connection, specific reference is made to a portion of her cross-examination during which she was confronted with a pretrial statement in which, contrary to her in-court testimony, she denied having relations with the accused on September 11, 1965. She "explained" the apparent inconsistency by declaring her pretrial statement referred to normal relations while her opposite testimony in court referred to commission by the accused of an act of sodomy with her. No limiting instruction was given either as to the findings or sentence.

We have repeatedly declared an instruction as to the limited purpose for which evidence of other ██ misconduct may be considered is required to be given by the law officer. United States

v Conrad, 15 USCMA 439, 35 CMR 411; United States v Back, 13 USCMA 568, 33 CMR 100; United States v Hoy, 12 USCMA 554, 31 CMR 140; United States v Bryant, 12 USCMA 111, 30 CMR 111. Indeed, in *Bryant,* supra, the Chief Judge declared, for the Court, that "the instruction is a necessary concomitant of such evidence." *Id.,* at page 115. And we have likewise stated that it matters not whether the evidence was adduced by the prosecution or defense or, as here, came as a matter unexpectedly volunteered by the witness. United States v Rodriquez, 17 USCMA 54, 37 CMR 318; United States v Baskin, 17 USCMA 315, 38 CMR 113; United States v Averette, 17 USCMA 319, 38 CMR 117. The failure of the law officer, therefore, to give an appropriate limiting instruction was error and, under the circumstances, prejudicial to the substantial rights of the accused.

## III

The second assignment which we consider relates to the charge that accused, in violation of Title 52, section 52–9907, Georgia Code, supra, and of Uniform Code, supra, Article 134, was found occupying a room at Horne's Motor Lodge, Augusta, Georgia, for an immoral purpose with Mrs. Huff. It is contended the law officer erred in determining as a matter of law that Horne's fell within the statute in question.

Section 52–9907, supra, provides as follows:

"**52–9907. False registration, or other representation of man and woman as husband and wife, in establishments named in Chapter 52–3.**—Any man or woman found occupying the same room in *any establishment within the meaning of Chapter 52–3 for any immoral purpose,* or any man or woman falsely registering as or otherwise representing themselves to be husband and wife in any such establishment shall, upon conviction thereof, be guilty of a misdemeanor and shall be fined or imprisoned in the discretion of the court. (Acts 1945,

**425**

pp. 326, 328.)" [Emphasis supplied.]

Chapter 52–3, Georgia Code, supra, includes "a tourist camp, cabin camp, tourist home, roadhouse, public dancehall, or any other similar establishment by whatever name called, where travelers, transient guest, or other persons are or may be lodged." *Id.,* section 52–301. It excludes "hotels and inns within the definition of sections 52–101 and 52–102." *Id.,* section 52–302. The latter sections refer to "all taverns, hotels, and houses of public general entertainment for guests." Motor hotels are not mentioned in Chapter 52–3 but are included in Chapter 52–4.

The manager of Horne's Motor Lodge testified as to the character of his establishment. He declared it was "a Motor Inn and a Motor Lodge, sir. The names are synonymous." It was properly a "motor hotel." Tourist camps "don't exist any more"; Horne's was not a tourist home and "certainly isn't" a roadhouse. It offered both rooms and restaurant facilities to guests. Describing it more specifically, the manager testified:

"Well, sir, we often call it a hotel. Instead of being a high riser like a hotel, it's only two stories and the guests park their own cars in front of their rooms. We're run on the same sense as a hotel."

The law officer, over defense objection, ruled, as a matter of law, that Horne's Motor Lodge came within Chapter 52–3 as a "tourist camp . . . or any other similar establishment" and was not a hotel or inn to be excluded from the operation of section 52–9907.

We disagree and conclude the law officer was in error in treating Horne's as a tourist camp ▮▮ or similar establishment rather than as a hotel. While no cases directly construing the Georgia statutes involved are called to our attention, we believe it clear, on the evidence presented in this record as to the nature of Horne's operation, that it is a "hotel" or "motor hotel" and thereby excluded from the

scope of section 52–9907 by the provisions of sections 52–302, 52–101, and 52–102. Cf. Copeland v Leathers, 206 Ga 280, 56 SE2d 530 (1949).

Thus, the cited statute indicates it is to be applied only to those establishments governed by Chapter 52–3, from whose coverage hotels and inns are expressly excluded. Georgia Code, supra, section 52–301. And it seems well settled that a motel or motor hotel such as Horne's is to be regarded as a hotel rather than as a tourist camp or similar establishment.

"Motel" is a recently coined word, derived from abbreviations of the words "motorist" and "hotel." People v Reilly, 20 Misc 2d 139, 198 NYS2d 654. (1959); Davis v State, 87 So 2d 416 (Florida) (1956). It generally denotes a small hotel where lodgings are available for hire. Schermer v Fremar Corp., 36 NJ Super 46, 114 A2d 757 (1955). It is a modern development in the field of inns and hotels. Logan v Sprinkle, 256 NC 41, 123 SE2d 209 (1961). As was noted in Schermer v Fremar Corp., supra, at page 760:

"A hotel is essentially an establishment which provides lodging for transients, and a place which would otherwise be an inn or hotel does not lose its character as such because of its mode of construction, the appellation bestowed on it by the proprietor, or the fact that food and drink cannot be obtained therein, or are available at the option of the guest."

The distinction between applying the provisions of such a statute as section 52–9907, supra, to tourist camps and establishments of like ilk as distinguished from hotels, inns, and enterprises of a similar nature is well recognized. Allinder v City of Homewood, 254 Ala 525, 49 So 2d 108 (1950). In the case of the former, "the prohibition might have resulted from the more frequent use or availability of such premises for immoral purposes" than in the case of hotels. Annotation, 22 ALR2d 774, 792. We also must recognize that motor hotels and motels have substantially re-

placed the traditional downtown hotel. America has become a nation of drivers. To service them, a whole new concept of hotelling has sprung up in the last few years. Motels now offer every traditional hotel service, with the added convenience of parking facilities and acceptance of informal attire. To classify these glittering structures, often composed of hundreds of rooms and boasting of every facility, with tourist camps, cabin camps, public dance halls, roadhouses, and similar establishments is to ignore this real change in public habits.

This, we cannot do. Penal statutes are to be strictly construed. United States v Curtin, 9 USCMA 427, 26 CMR 207. Nor can enumeration of a certain type of establishment within a statute be interpretively expanded beyond its intended scope. United States v Ortiz, 16 USCMA 127, 36 CMR 283; Crawford, The Construction of Statutes, § 325 (1940). The evidence in this case stands unrebutted that Horne's Motor Lodge was operated as a hotel. As such, it was without the purview of section 52–9907, supra, and the law officer erred prejudicially in advising the court, as a matter of law, to the contrary. In light of this conclusion, the findings of guilty must be set aside and the charge ordered dismissed.

### IV

The remaining assignments of error need not be discussed. In the main, they deal either with corroboration of the prosecutrix as to the adultery charge or with further alleged deficiencies in the law and evidence regarding the count of violating section 52–9907, supra. As to the latter, we have noted that the exclusion of the facility involved from the statute's operation requires reversal and dismissal. While normally a rehearing would be authorized as to the adultery count, we believe it likewise should be dismissed.

Scrutiny of this record leaves one with an abiding feeling that this proceeding was nothing more than an attempt to litigate in a criminal court civil matters which the courts of North Carolina and Georgia had already refused to entertain. Mrs. Huff frankly admitted on the record that her interest was "to get his scalp." Her testimony is evasive, contradictory, and characterized by vindictiveness toward the accused. The matter has been in various stages of investigation or trial since November 1965, and, during the entire period, it appears accused was restricted to his station, quarters, and the Fayetteville area. In short, on the evidence presented, we believe it well within our discretion to terminate the proceedings. Code, supra, Article 67, 10 USC § 867; United States v Sheeks, 16 USCMA 430, 37 CMR 50. We so order.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Army. The charge and its specifications are ordered dismissed.

Chief Judge QUINN and Judge KILDAY concur.