UNITED STATES, Appellee

v

WILLIAM LUZZI, Private, U. S. Army, Appellant

18 USCMA 221, 39 CMR 221

No. 21,462

March 28, 1969

Captain Norman L. Blumenfeld argued the cause for Appellant, Accused. With him on the brief were Colonel Daniel T. Ghent, Major David J. Passamaneck, and Captain Dennis R. Hunt.

Captain Harvey L. Anderson argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel David Rarick and Major Edwin P. Wasinger.

DARDEN, Judge:

A general court-martial found the accused guilty of a single specification of larceny and sentenced him to a dishonorable discharge, total forfeitures, reduction to the lowest pay grade, and confinement at hard labor for two years. Intermediate appellate authorities affirmed the conviction. This Court granted the petition of the accused on two issues:

1. Whether the law officer's instructions on other misconduct were patently erroneous and ambiguous to the substantial prejudice of the accused.

2. Whether that part of the staff judge advocate's review that contained information regarding seven juvenile arrests of the accused and disposition of these arrests by the juvenile court was highly prejudicial to the substantial rights of the accused.

On the evening of August 8, 1967, each of the victims left his wallet in the pocket of his trousers at the time of retiring in barracks.

The next morning the contents of the wallets were missing. On August 21, 1967, after a full warning in compliance with Article 31 of the Uniform Code of Military Justice, 10 USC § 831, and about his right to counsel, the accused confessed to entering the barracks and to taking money from about ten wallets. Later he met a female companion and accompanied her to the Duchess Motel where they remained over night. During the two hours before the larceny, the accused had drunk eight to ten shots of whiskey.

At the trial, the accused elected to testify in his own behalf. In general, he acknowledged the truth of his pretrial statement, but he denied any intent to steal. After he took the money, he returned to his room to count it. With a part of the money, he returned to a night club where he met a woman and eventually accompanied her to the Duchess Motel. He testified that the next morning he remembered taking the money and attempted to determine how to return it to the owners. He decided against trying to do so as a result of his belief that an attempted return would be too risky. He decided to keep the rest of the money to pay a debt.

At the trial, the law officer decided to treat testimony about the wallets and the money taken by the accused on the same night and in the same barracks—but which were not the subject of charges or specifications—and evidence that the accused had spent the night with a woman not his wife at the Duchess Motel as uncharged misconduct. Accordingly, he instructed the court as follows:

"Certain evidence has been admitted in the trial of this case which is contrary to the general rule. The general rule is that evidence that the accused committed other offenses or acts of misconduct is not admissible as tending to prove his guilt of the offense charged, for ordinarily such evidence would be useful only for the purpose of raising inferences that the accused has a disposition to do acts of the kind committed or criminal acts in general. However, if evidence of other offenses or other acts of misconduct of the accused has some value as tending to prove something other than the fact to be inferred from the disposition of the accused, the reason for excluding the evidence is not applicable. Consequently, the law officer has permitted the introduction into evidence of evidence tending to show that, as came out in the evidence, perhaps ten wallets had been looked into whereas the accused is only charged in this case with six instances of larceny; and evidence that the accused had registered at a motel with a woman. The court is instructed that in admitting this evidence the law officer admitted it not for the purpose of showing the bad character of the accused but only for

the purpose of showing the course of conduct bearing on the question of the intent of the accused, which is a requisite, necessary element in this offense, and the plan, motive or design of the accused, and also upon the question of the credibility of the accused as a witness pertaining to the question of voluntary intoxication. The court will not consider this evidence of other acts of misconduct or other offenses as tending to prove any other fact."

Before this Court the accused argues that the instructions, supra, were erroneous and ambiguous and that they substantially prejudiced him.

Paragraph 138g of the Manual for Courts-Martial United States, 1951, enunciates a general rule that evidence the accused has committed other offenses or acts of misconduct is not admissible as tending to prove his guilt. Such evidence ordinarily would be useful only to raise an inference that the accused is disposed to commit criminal acts in general and, if the disposition were to be the basis for an inference that the accused committed the act with which he had been charged, the rule forbidding an inference of guilt from the bad moral character of the accused would apply. Certain exceptions to the general rule are described in the Manual. One of these is that evidence of other offenses or acts of misconduct is admissible if it tends to prove a plan or design of the accused. In this case, the accused argues that his spending the night with a woman not his wife is not material, relevant, or competent evidence as to any of the issues of the trial.

Because of decisions in United States v Snyder, 1 USCMA 423, 4 CMR 15, and United States v Dixon, 17 USCMA 423, 38 CMR 221, that spending the night in a motel room with a woman is not a military offense, one could argue that this action of the accused does not constitute "other misconduct" but that such action is only a violation of a moral code held by many in our society as a standard of proper conduct. A con-

tinuation of this argument is that such conduct could hardly rise to the level of being inflammatory.

The Court believes that present circumstances obviate any necessity for a decision of whether the action of the accused in this respect was misconduct. From the evidence, the triers of fact could reasonably infer that the thefts were motivated by a desire for a night on the town. It was, therefore, relevant and admissible for the purpose of so proving. United States v Jones, 2 USCMA 80, 6 CMR 80; United States v Pavoni, 5 USCMA 591, 18 CMR 215.

Since the evidence of the taking of other wallets at nearly the same time and nearly the same place tended to show the design and intent of the accused as to the charged offenses, the Court considers that this evidence was also properly admissible. United States v Johnson, 3 USCMA 447, 13 CMR 3; United States v Petty, 3 USCMA 87, 11 CMR 87.

The instructions quoted, supra, make clear that these facts were not admitted because they tended only to show the accused's bad character. Instead, they were offered to prove guilt in the manner discussed above.

The second complaint about the admission of evidence of misconduct not charged and the related instruction is that some of the former was used to attack the credibility of the accused on cross-examination. In United States v Krokroskia, 13 USCMA 371, 32 CMR 371, this Court restated the doctrine that misconduct involving moral turpitude or affecting credibility may be shown on cross-examination without regard to proof of conviction. We then suggested that the rule applied only to witnesses other than an accused. Cf. United States v Britt, 10 USCMA 557, 28 CMR 123; United States v Hubbard, 5 USCMA 525, 18 CMR 149. Later, in United States v Robertson, 14 USCMA 328, 34 CMR 108, and in United States v Russell, 15 USCMA 76, 35 CMR 48, this Court held that the credibility of an accused

**223**

could not be tested on cross-examination by evidence of other misconduct not resulting in a conviction of a felony or crime of moral turpitude.

In *Robertson* and *Russell,* it is important to note that the acts of misconduct used to impeach were acts having no relevancy to the crimes charged. Here, as we have shown, they do. This same misconduct, however, also rebuts the appellant's claim of drunkenness. The accused testified with some precision to the circumstances of his having gone to the motel and to his having made the arrangements for the room but he also attempted to convince the court that he was so intoxicated before the larcenies that he did not know what he was doing.

That there is a major distinction in these circumstances compared to those set out in *Robertson* and *Russell* is seemingly made apparent by a portion of Lovely v United States, 169 F2d 386, 389 (CA 4th Cir) (1948), quoted in *Robertson,* at page 334. It reads:

" 'The rule which thus forbids the introduction of evidence of other offenses *having no reasonable tendency to prove the crime charged,* except in so far as they may establish a criminal tendency on the part of the accused, is not a mere technical rule of law.' " [Emphasis supplied.]

Certainly this suggests propriety in concluding that the law officer properly permitted the use of this evidence. It may well be, however, that he erred in instructing that it could also be used in the matter of credibility.

But whatever our conclusion, accused suffers no harm from the introduction of the material, ■■■ for in this case the other evidence of accused's guilt is overwhelming. He voluntarily gave a pretrial confession. At the trial, he denied the intent to steal at the time of the takings but admitted spending a portion of his ill-gotten gain and then forming the intent the next morning to keep the remainder in order to pay debts. Against this, any evidence of the motel escapade is reduced to insignificance. United States v Britt, supra.

The second issue on which this Court granted review is whether that part of the staff judge advocate's review which contained information on seven arrests of the accused as a juvenile and disposition of these arrests by the juvenile court was prejudicial to the substantial rights of the accused.

In United States v Roark, 8 USCMA 279, 24 CMR 89, this Court held that a law officer erred in permitting cross-examination into earlier acts of misconduct that might have involved moral turpitude by an accused during his minority and into accused's committal to a training school by a state juvenile court. For minors, this Court said that opinion, the policy of protecting the infant outweighs the necessity of impeaching his veracity.

But in United States v Barrow, 9 USCMA 343, 26 CMR 123, this Court held that a staff judge advocate may properly refer in his post-trial review to juvenile misdeeds and convictions of the accused and that it is permissible for a reviewing authority to consider any past misconduct of an accused in assessing the appropriateness of the sentence, regardless of the age of the accused at the time of commission "unless too remote to be of any significance." *Id.,* at page 346. The Court's opinion in that case stated that, "There is no irreconcilable conflict in concepts which prevent the use of juvenile misdeeds before findings of guilt and innocence, and then permit their consideration by the reviewing authority on the punishment he deems appropriate." *Id.,* at page 344. The *Barrow* opinion compares the practice it permits with the practice in civilian courts where judges use probation reports that cover comprehensively a defendant's early environment, family background, character, and behavior to guide them in arriving at an appropriate sentence. The opinion also points out that these reports may not

224

be used by the jury before conviction but they afford a sound basis for the imposition of a proper punishment. In military practice, sentence has been imposed before preparation of the staff judge advocate review for the convening authority who may change the sentence only in favor of the accused. It indicates that a record of juvenile misconduct, if used, can result only to diminish the possibility that the accused may be awarded a lesser sentence than the one imposed by the court.

The following quotation from *Barrow* is an apt expression of the reasons for permitting consideration of juvenile offenses in staff judge advocate reviews, reasons we consider equally cogent today:

"A convening authority has unlimited power to help an accused, but he also has a duty to consider the rights of the Government. If we are to permit post-trial interviews to work to the mutual benefit of both, we must not say to convening authorities that they may consider a good youthful record but must close their eyes if the past is bad. The services invariably contain some bad character risks, and we would hide ourselves from reality if we did not notice the crimes of violence committed by minors. Too many youthful gangs bent on murdering, raping, yoking, stealing, and assaulting are roaming the city streets for us not to know that youthful incorrigibles are difficult to reform. To make an intelligent estimate, in performing his statutory duty to affirm so much of the sentence as he deems appropriate, a convening authority should know his subject well and, if the accused's life history shows he is a juvenile gangster, that should not be concealed from the evaluator. Surely we would make a farce out of proceedings founded on wisdom and experience if we required the convening authority to govern his vistas of inquiry by the calendar." [*Id.*, at page 345.]

We are not unmindful that United States v Lanford, 6 USCMA 371, 20 CMR 87; United States v Griffin, 8 USCMA 206, 24 CMR 16; and United States v Jackson, 9 USCMA 298, 26 CMR 78, have been cited as authority for the proposition that if the staff judge advocate directs the attention of the convening authority to matters affecting the sentence that are detrimental to the accused which are not found in the record, the accused must be given a fair and reasonable opportunity to rebut such information or to explain any matter that may be detrimental to him. In the instant case, the record shows that in a post-trial interview, the accused discussed his military and civilian background, including the juvenile offenses and that he stated the offenses "were committed when he was associated with a gang of juveniles, and it was his misfortune to get caught."

In United States v Wilson, 9 USCMA 223, 26 CMR 3, this Court reversed a finding of guilty because the staff judge advocate had conducted a post-trial interview with an accomplice and included in his review for the convening authority a statement of the staff judge advocate's being so impressed by the spontaneous and candid account of the incident by the accomplice that the staff judge advocate no longer retained any doubt in his mind of the guilt of the accused. The Court's opinion in that case reflected its realization that the result "may be termed a 'one-way street' in an accused's favor in which he can only win, and never lose. . . . It is while the case is at the convening authority level that the accused stands the greatest chance of being relieved from the consequences of a harsh finding or a severe sentence. To permit consideration by the convening authority of matters falling outside the record to bolster a conviction strikes us as an unwholesome deviation from basic concepts of fair play. The Government's omissions in court cannot be cured by *ex parte* proceedings out of court." *Id.*, at page 226.

We have no difficulty in harmonizing the result in that case with the

decision of the Court today. In *Wilson*, the staff judge advocate had conducted a post-trial interview with an accomplice of the accused to resolve doubts that had arisen about the guilt of the accused. Here, the information used in the review of the staff judge advocate was available in the personnel records of the accused and was known to him. It was set forth to give the convening authority full information on which to base a discretionary decision whether to approve any or all of the sentence.

One other subject requires attention. In United States v Barrow, supra, this Court approved the use of evidence of juvenile offenses in the staff judge advocate's review "regardless of . . . age at the time of commission unless *too remote to be of any significance.*" (Emphasis supplied.) 9 USCMA, at page 346. Seven juvenile offenses were shown in the review of the instant case. For the first of these offenses, the age of the accused was eleven; for the next two, his age was fourteen; and for the last four, he was fifteen years old. One might argue persuasively that the first of these seven offenses was too remote to be of any significance, but we believe that as a group the offenses constituted significant information that the convening authority properly considered and that it was not error for him to do so.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

My brothers err, I believe, in failing to take into account the significance, for juvenile proceedings, of the Supreme Court's decision in In re Gault, 387 US 1, 18 L Ed 2d 527, 87 S Ct 1428 (1967), that such proceedings must be conducted in a manner as to accord the juvenile concerned " 'the essentials of due process and fair treatment.' " *(Id.,* at page 30.) Specifically, the Court held, this includes: (1) appropriate notice of charges; (2) the right to be represented by retained or court-appointed counsel; and (3) constitutional protection against self-incrimination and for confrontation by witnesses subject to cross-examination. The court declined to rule on whether a juvenile is entitled to appellate review, and the concomitant necessity for a transcript of the proceedings, but called attention to the difficulties encountered by the lack of a record in instances where a writ of habeas corpus is sought. Since Gault had not been afforded these constitutional protections, the order of the Supreme Court of Arizona dismissing his petition for a writ of habeas corpus was reversed and the cause was remanded for further proceedings.

In the case at bar, the accused's service record revealed that, prior to his entry into the service, he was the subject of juvenile court proceedings in Union City, New Jersey, on seven different occasions. The first took place in October 1960, when the accused was eleven years old and the last in December 1964, while he was still only fifteen years of age. He was reprimanded on the first three occasions and placed on probation in each of the last four instances. Final release from probation occurred on April 15, 1966. He enlisted in the Army for a three-year period the following October.

In the clemency portion of his review for the convening authority, the staff judge advocate listed these proceedings in order, including the type of offense involved, the age of the accused at each time, the court's disposition, and the date of final release from probation. He also informed the convening authority that, in his interview with the accused, the latter discussed his civilian background and stated that the juvenile offenses were committed when he associated with a gang of juveniles and it was his misfortune to get caught.

The majority find no error in the staff judge advocate's post-trial referral to these juvenile misdeeds and convictions on the basis of this Court's opinion in United States v Barrow, 9 USCMA 343, 26 CMR 123. There we

226

compared the practice with that followed in civilian courts where judges use probation reports which cover comprehensively a defendant's early environment, family background, character, and behavior to guide them in arriving at an appropriate sentence. Since, in military practice, sentence has been imposed before preparation of the staff judge advocate review, we noted in *Barrow* that if a record of juvenile misconduct is used in this review, concededly, the only result would be to diminish the possibility that the accused may be awarded a lesser sentence, for a convening authority can change a sentence only in favor of the accused. However, as we stated:

"... If we are to permit post-trial interviews to work to the mutual benefit of both [the accused and the Government], we must not say to convening authorities that they may consider a good youthful record but must close their eyes if the past is bad. ... To make an intelligent estimate, in performing his statutory duty to affirm so much of the sentence as he deems appropriate, a convening authority should know his subject well and, if the accused's life history shows he is a juvenile gangster, that should not be concealed from the evaluator." [*Barrow,* supra, at page 345.]

Whatever validity there may have been in the view expressed in *Barrow* (see also United States v Lowe, 9 USCMA 417, 26 CMR 197), is, in my opinion, placed in doubt by the decision in *Gault.* In *Gault,* the Court reviewed the history and theory underlying the development of juvenile practice and I need not repeat it here. Suffice to say, as noted therein, the States are uniform in viewing juvenile proceedings as *civil in nature and not criminal.* The laws of the District of Columbia are in accord. See District of Columbia Code, 1967 edition, Title 11, section 11–1551, *et seq.* In White v Reid, 125 F Supp 647, 649 (DC DC) (1954), the court held:

"Proceedings against juveniles brought in the Juvenile Court are not criminal and penal in character, but are an adjudication upon the status of a child in the nature of a guardianship imposed by the state as *parens patriae* to provide the care and guidance that under normal circumstances would be furnished by the natural parents."

So too the Federal laws. In Fagerstrom v United States, 311 F2d 717, 720 (CA 8th Cir) (1963), that court said:

"To be adjudged a juvenile delinquent and committed to the custody of the Attorney General under the Juvenile Delinquency Act, is not to be convicted of or sentenced for a crime. United States v Borders, DC ND Ala, 154 F Supp 214; affirmed, Borders v United States, 5 Cir, 256 F2d 458; United States v Kinsman, DC SD Cal, 195 F Supp 271, 273. The very purpose of the Act is to avoid the prosecution of juveniles as criminals."

Our decision in United States v Roark, 8 USCMA 279, 24 CMR 89, is in accord with this view. There we held that it was error for the law officer to permit cross-examination into earlier acts of misconduct of the accused during his minority that might have involved moral turpitude, as well as inquiry into his committal to a training school by a State juvenile court. As we said in *Roark,* at page 284, "in the case of minors the *policy* of protecting the infant outweighs the necessity of impeaching his veracity." (Emphasis supplied.) The Chief Judge based his separate concurrence in *Roark* on the fact that the early proceedings against the accused took place in a jurisdiction (Virginia) where such proceedings did not constitute a conviction for crime and hence were inadmissible for impeachment purposes. Manual for Courts-Martial, United States, 1951, paragraph 153*b.*

The juvenile proceedings in this case took place in New Jersey where such proceedings are rehabilitative rather than penal. In re State in Interest of W. O., 100 NJ Super 358, 242

A2d 17, 19 (1968). "The rules of evidence do not apply to the same extent as in ordinary criminal cases. See Annotation, 'Applicability of rules of evidence in juvenile delinquency proceeding,' 43 ALR2d 1128 (1955). . . . However, in In re Gault, 387 US 1, 87 S Ct 1428, 18 L Ed 2d 527 (1967) it was held that proceedings in the Juvenile Court were subject to the constitutional requirement of due process of law."

In State In re J. M., 103 NJ Super 88, 246 A2d 536 (1968), the court held that *Gault* is to be applied retroactively, at least in that State. That court, citing cases, acknowledged that retroactive application of *Gault* had been denied in Virginia, but granted in Arizona, Florida, Massachusetts, and Wisconsin. Factually, it appeared that the notice of the scheduled hearing, which had been sent to the juvenile's mother contained the following statement: " 'You have the right to retain and be represented by counsel.' " However, "He was not represented by counsel nor did he or his mother request the court to assign an attorney to represent him. Under the practice then existing, based on the law applicable at that time, the juvenile was not advised that the court would assign an attorney to represent him if he so desired and could not afford to retain his own attorney." The court, on the basis of *Gault*, voided the former hearing and ordered a new proceeding. In its opinion, the court stated:

"Just as an adult defendant in a criminal action must be found guilty before he can be penalized, a juvenile in a juvenile proceeding must be adjudged delinquent (guilty) before the court can infringe upon his freedom by institutionalization or otherwise. It would seem compelling that there should be no distinction made as to the need for a reliable guilt-finding process, whether the proceeding be in the adult criminal court or the juvenile court. See State in the Interest of Carlo, 48 NJ 224, 236, 255 A2d 110 (1966)." [*Ibid.*, at pages 538, 539.]

Compare In re Whittington, 391 US 341, 20 L Ed 2d 625, 88 S Ct 507 (1968), where the Court vacated an order of the Supreme Court of Ohio and remanded the case for consideration in light of *Gault* since the Ohio case had been decided two months prior to *Gault* and without consideration of the principles enunciated therein.

It is apparent that the decision in *Gault* has already had a profound effect on the conduct of juvenile proceedings. In United States v Borders, 154 F Supp 214 (ND Ala) (1957), that court, at page 216, had held that, "To sustain an adjudication of delinquency, most of the authorities require the same amount and kind of proof as would be required in an ordinary civil action." But Judge Sobeloff, in United States v Costanzo, 395 F2d 441, 444 (CA 4th Cir) (1968), quoting from *Borders,* said, "[t]hese ideas are at war with the philosophy painstakingly expounded in the Supreme Court's recent decision, In re Gault, supra, and can no longer guide us. *Gault* unequivocally rejects the reasoning typified in *Borders* and ineluctably requires a different conclusion." With respect to the jurisdiction of particular interest in this case, we were informed by appellate defense counsel that New Jersey recently adopted new rules for juvenile proceedings. In their brief, they state: "New Jersey Rule of Practice, RR 6:3–4(c) (1967 Amendment) provides 'in juvenile causes the court shall advise the juvenile and his parents, guardian or custodian of their right to retain counsel and, if they are unable to afford counsel . . . the court shall assign counsel to represent them.' " In addition to the New Jersey cases cited above, which took cognizance of the *Gault* decision, other State courts have similarly acted. See, generally, People v Allen, 22 NY2d 465, 293 NYS2d 280 (1968); Workman v Commonwealth, 429 SW2d 374 (Ky) (1968); Commonwealth v Superintendent of State Cor. Inst., 212 Pa Super 422, 242 A2d 903 (1968); Leach v State, 428 SW2d 817 (Tex) (1968); In re Creek, 243 A2d 49 (DC) (1968); In re D., 30 AD2d 183, 290 NYS2d 935 (1968).

Retroactive application of *Gault* has been denied in Cradle v Peyton, 208 Va 243, 156 SE2d 874 (1967), and State v Hance, 2 Md App 162, 233 A2d 326 (1967), but granted in Application of Billie, 103 Ariz 16, 436 P2d 130 (1968); Steinhauer v State, 206 So 2d 25 (Fla) (1967); Marsden v Commonwealth, 227 NE2d 1 (Mass) (1967); State v Circuit Court of Brown County, BR. 1, 37 Wis 2d 329, 155 NW2d 141 (1967). While in the Virginia and Maryland cases, the courts declined to retroactively apply *Gault*, these cases can be distinguished since each of them dealt not with a determination of delinquency but with certification of the juvenile to the criminal courts for indictment and trial. With regard to the question, however, the court in Cradle v Peyton, supra, stated at page 879, that if retroactivity were applied,

". . . Every state would be required to void the conviction of every juvenile who was not advised of his right to be represented in juvenile court proceedings by retained counsel or, if unable to afford counsel, by court-appointed counsel."

Neither this record nor the allied papers, including the briefs of counsel, reflect whether this accused was represented by counsel or afforded the other protections which accord "due process and fair treatment" in his juvenile court appearances. While appellate defense counsel have ably briefed the issue before us they have not furnished us with this vital information. They do, however, point out that "the procedural safeguards not applicable when appellant was considered delinquent now generally apply." In addition they urge us to rule that misconduct during minority is not proper matter to be included in post-trial reviews, on the ground that: (1) Juvenile adjudications are not criminal convictions, but State determinations on how to handle young people who need correction and rehabilitation; (2) juvenile adjudications are not to be used for any purpose not permitted by the pertinent juvenile statutes; and (3) new legal developments make invalid pre-*Gault* juvenile proceedings. In effect they request that our decision in United States v Barrow, supra, be overruled.

I do not believe that *Barrow* need be overruled for we were aware at the time of that opinion that juvenile proceedings were not criminal in nature and of the statutory limitations on the use of such data. I agree, however, that *Gault* has cast a new light on the proceedings in juvenile court and many such cases could, perhaps, be voided. But that is a matter for the appropriate courts.

In my opinion, as appellate defense counsel also urge, a more basic flaw occurred in the manner in which this information was presented to the convening authority. As noted, the staff judge advocate simply listed the offenses and stated that they were matters for the Union County, New Jersey, Juvenile Court. His manner in doing so conveyed the impression that appellant, as a juvenile, had been, on six occasions, convicted of crimes. He gave no explanation of the meaning of such proceedings—rehabilitative not criminal; he did not disclose the statutory restrictions on the use of such data; nor did he indicate that juvenile hearings generally lack the legal safeguards of adult criminal proceedings, and should be viewed in such light. Absent this information, the convening authority was without a proper basis for the exercise of his discretion to grant clemency. Articles 61 and 64, Uniform Code of Military Justice, 10 USC §§ 861 and 864; United States v Bennett, 18 USCMA 96, 39 CMR 96.

I do not believe the staff judge advocate intended to mislead, rather, I think it was an oversight, but a grievous one, since the convening authority is a layman and cannot be expected to know or appreciate the subtle differences of juvenile vis-a-vis criminal proceedings. His dependency upon the staff judge advocate for proper and complete advice, especially as pertains to his clemency powers, was most recently reviewed by this

**229**

Court in United States v Bennett, supra, and need not be repeated. It is enough that I believe the advice here fell short of that required, thus necessitating a new review by the staff judge advocate.

With regard to the question of whether the law officer's instructions on other misconduct were patently erroneous and ambiguous to the substantial prejudice of the accused, I also disagree with the majority's view on this matter. As we stated in United States v Robertson, 14 USCMA 328, 331, 34 CMR 108, quoting, in part, from United States v Provoo, 215 F2d 531 (CA 2d Cir) (1954), " 'specific acts of misconduct not resulting in conviction of a felony or crime of moral turpitude are not the proper subject of cross-examination for impeachment purposes.' " See also United States v Russell, 15 USCMA 76, 35 CMR 48.

I speak only of that evidence reflecting that after the purported larcenies, the accused returned to the night club where he met a woman with whom he spent the night in a local motel. There is simply no evidence in the record that the wrongful takings were motivated by a desire to procure sexual relations or to pay for a motel room. While it is true that fornication, in the absence of aggravating circumstances, is not an offense under military law (United States v Snyder, 1 USCMA 423, 4 CMR 15; cf. United States v Dixon, 17 USCMA 423, 38 CMR 221), it is, nevertheless, a departure from the norm of human behavior and, as such, it may not be presented on the pretext that it affects credibility. United States v Long, 2 USCMA 60, 6 CMR 60. See also United States v Krokroskia, 13 USCMA 371, 32 CMR 371.

Since the court was, in my opinion, erroneously informed that it could consider this evidence "upon the question of the credibility of the accused as a witness pertaining to the question of voluntary intoxication," the main thrust of his defense, prejudice is apparent. United States v Robertson and United States v Russell, both supra.

Accordingly, I would reverse the decision of the board of review and direct a rehearing.